**U.S.C.A No. 22-30141**
**U.S.D.C. No. 1:21-cr-00243-BLW**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff/Appellee,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **MIGUEL MICHAEL ALANIZ,** | ) |
| | ) |
| **Defendant/Appellant.** | ) |
| | ) |
| _____ | ) |

Appeal from the United States District Court
For the District of Idaho
The Honorable B. Lynn Winmill, District Court Judge

**OPENING BRIEF OF DEFENDANT-APPELLANT**

Miles Pope
Federal Defender Services of Idaho
702 West Idaho Street, Suite 1000
Boise, Idaho 83702
Telephone: (208) 331-5500
Attorneys for Defendant-Appellant
MIGUEL MICHAEL ALANIZ

# TABLE OF CONTENTS

Issue Presented for review ........................................................... 1

Introduction ................................................................................. 1

Statement of the case ................................................................. 3

    A.  Mr. Alaniz sells drugs to a confidential informant on three occasions; he never discusses, brandishes, or displays firearms on any of these occasions. ................................................................... 3

    B.  A grand jury indicts Mr. Alaniz for drug trafficking and he pleads guilty without a plea agreement. ........................................... 4

    C.  The draft PSR concludes that Mr. Alaniz is eligible for safety-valve (notwithstanding the presence of guns in his home and truck) but it also gives him a 2-level enhancement for possessing firearms under USSG § 2D1.1(b)(1). ....................................................... 5

    D.  Objections to the draft PSR center on the role of firearms in calculating Mr. Alaniz's offense level, yet the government elects to introduce no historical evidence to show that USSG § 2D1.1(b)(1) is consistent with the Nation's historical tradition of firearm regulation ...................................................................................... 7

    E.  The sentencing court rules that Mr. Alaniz is safety-valve eligible – making a finding that firearms probably played no role in his drug trafficking crime – but applies USSG § 2D1.1(b)(1). ............................. 9

    F.  The sentencing court imposes sentence and this appeal follows... 10

Jurisdictional Statement ............................................................ 10

Argument Summary .................................................................... 11

Argument ..................................................................................... 12

    A.  *Bruen*'s Second Amendment framework ........................ 12

    B.  *Bruen* step one: the Second Amendment presumptively protects Mr. Alaniz's firearms possession. ......................................... 14

        1.  The Second Amendment protects each member of the national community's individual right to possess firearms. ........................... 14

2. Because Mr. Alaniz is a member of the national community, the Second Amendment presumptively protects his conduct in this case. ................................................................................................ 17

C. The government utterly failed to carry its burden to show that punishing Mr. Alaniz for possessing firearms in this case is consistent with the Nation's historical traditions of firearm regulation. ............. 20

1. The government's utter failure to adduce evidence or argument supporting the conclusion that applying USSG § 2D1.1(b)(1) to Mr. Alaniz is consistent with the Nation's historical traditions of firearm regulation is fatal. ............................................................... 20

2. The district court's order fails to show that applying § 2D1.1(b)(1) to Mr. Alaniz is consistent with the Nation's historical traditions of firearm regulation. ........................................................... 24

Conclusion ........................................................................................ 30

Statement of related cases .................................................................. 31

# TABLE OF AUTHORITIES

## Cases

*Annex Books, Inc. v. Indianapolis*, 740 F.3d 1136 (7th Cir. 2014).........21

*Commonwealth v. Hope*, 39 Mass 1 (Mass. 1839)...................................27

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................ 12, 15

*Jones v. Bonta*, 34 F.4th 704 (9th Cir.) ...................................................17

*Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019)................................17

*National Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, and Firearms*, 700 F.3d 185, 194 (5th Cir. 2012)......................................25

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ........................................................................................ passim

*United States v. Bernard*, 24 F. Cas. 1131 (C.C.D.N.J. 1819)...............27

*United States v. Bullock*, 3:18-cr-165 (S.D. Miss. Oct. 27, 2022) ...........20

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ........................12

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001) ........................25

*United States v. Goodwin*, 457 U.S. 368 (1982)......................................11

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ...........................26

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022)..........17

*United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015)17

United States v. Moreno, 811 F. App'x at 224........................................25

*United States v. Napolitan*, 762 F.3d 297 (3d Cir. 2014) .......................27

*United States v. Nelson*, 222 F.3d 545 (9th Cir. 2000) .......................5, 18

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000)) ..............................................................................................20

*United States v. Potter*, 630 F.3d 1260 (9th Cir. 2011)...........................27

*United States v. Vasquez-Landaver*, 527 F.3d 798, 805 (9th Cir. 2008) 11

## Statutes

18 U.S.C. 3553(f) .......................................................................................1

## United States Sentencing Guidelines

USSG 2D1.1................................................................................... passim

## ISSUE PRESENTED FOR REVIEW

Does the Second Amendment allow a non-prohibited-possessor convicted of drug distribution to be punished more severely simply because they possessed firearms – even though those firearms were probably unconnected to any drug trafficking activity?

## INTRODUCTION

In Spring of 2021, Mike Alaniz sold cocaine out of his home to a confidential informant on three separate occasions (SD 149). On at least the last of these occasions, Mr. Alaniz also had firearms in his home. Unsurprisingly. At the time of his offense, Mr. Alaniz was a longtime hunter and a non-felon – someone who had a legitimate interest in firearms and who could lawfully own, possess, and use guns (SD 166-170).

Mr. Alaniz eventually pleaded guilty to distributing cocaine (ER 100-123). At his sentencing, the district court made two important rulings. First, over the government's objection, it ruled that Mr. Alaniz was eligible for safety-valve relief under 18 U.S.C. 3553(f) – finding, in the course of reaching this result, that Mr. Alaniz probably did not possess firearms in connection with drug trafficking (ER 43-44). Even

though firearms were present in Mr. Alaniz's home (and in the vehicle out of which he was arrested), the court found, by preponderance of the evidence, that those firearms played no role in Mr. Alaniz's drug trafficking crime. The Court accordingly reduced Mr. Alaniz's offense level by 2 levels under USSG § 2D1.1(b)(18) (which provides for a 2-level reduction in offense level for anybody who is safety-valve eligible).

But the Court also made a second ruling concerning the firearms in this case. Applying USSG § 2D1.1(b)(1) – the "gun bump" provision of the drug sentencing guidelines – it found that Mr. Alaniz's offense level needed to be increased by 2 levels because. IN reaching this result, the court reasoned that – even though his firearms *probably* played no role in his drug-trafficking crime – it was not *clearly improbable* that the firearms were unconnected to drug trafficking (ER 42-43). Accordingly, over Mr. Alaniz's objection, the sentencing court enhanced Mr. Alaniz's guidelines range – and enhanced his punishment – because of (as the court put it) the "mere presence" in his home and truck of firearms he was lawfully allowed to possess (ER 44).

That enhanced punishment is the subject of this appeal. Following the Supreme Court's watershed opinion in *New York State Rifle & Pistol*

*Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), enhancing Mr. Alaniz's punishment based on the mere presence of firearms in his home and truck unconstitutionally punishes him for the exercise of his Second Amendment rights. So this brief explains.

## STATEMENT OF THE CASE

After pleading guilty to four counts of cocaine trafficking, Mike Alaniz was sentenced to a below-guidelines sentence of fifteen months in prison followed by three years of supervised release (ER 7-8). This appeal concerns the constitutionality of the district court's firearms-related guidelines calculations – whether the district court erred in enhancing Mr. Alaniz's punishment based on the presence of firearms in his home and in the vehicle in which he was arrested in this case.

### A. Mr. Alaniz sells drugs to a confidential informant on three occasions; he never discusses, brandishes, or displays firearms on any of these occasions.

Mr. Alaniz's cocaine trafficking took place during the spring of 2021 (SD 149). Mr. Alaniz sold 1 ounce of cocaine to a confidential informant on April 1, 2021, another ounce to the same confidential informant on April 19, 2021, and another four ounces (again to the same informant) on May 18, 2021 (*id.*).

Each drug sale followed the same basic format: Mr. Alaniz would leave cocaine stashed in his truck, which was parked outside of his home (ER 21-22 (prosecutor's description of drug sales). The informant would then collect the drugs and deposit a brown paper bag of cash in the cab of the truck (*id.*). Mr. Alaniz would later retrieve the money (*Id.*). During the entire course of this offense, no firearms were discussed, brandished, or displayed.

On May 18, 2021 – following the four-ounce sale – police conducted a traffic stop on Mr. Alaniz, arrested him, and searched his home (SD 149-150). During the traffic stop, police located a loaded handgun near the center console of Mr. Alaniz's truck (SD 149). There were no drugs in the vehicle (ER 23 (prosecutor's concession that no drugs were found in the truck)).

Police then searched Mr. Alaniz's home. During the course of this search, police located twelve firearms, marijuana, and 47 grams of cocaine (SD 150).

## B. A grand jury indicts Mr. Alaniz for drug trafficking and he pleads guilty without a plea agreement.

A grand jury indicted Mr. Alaniz for drug trafficking on September 14, 2021, charging him with three counts of cocaine distribution and one

count of possession with intent to distribute cocaine (ER 125-129). On May 16, 2022, Mr. Alaniz pleaded guilty, without a plea agreement, to these four counts (ER 100). He then proceeded to sentencing.

### C. The draft PSR concludes that Mr. Alaniz is eligible for safety-valve (notwithstanding the presence of guns in his home and truck) but it also gives him a 2-level enhancement for possessing firearms under USSG § 2D1.1(b)(1).

In the run-up to Mr. Alaniz's sentencing hearing, a probation officer prepared a draft presentence report. That report recommended the following guidelines calculations:

- A base offense level of 18 because Mr. Alaniz distributed a total drug weight of 211.5 grams of cocaine (SD 151);

- A 2-level enhancement under USSG § 2D1.1(b)(1) because "the defendant possessed thirteen firearms" – the twelve in his home plus the gun in his truck – "during the offense" (SD 151);

- A 2-level decrease in Mr. Alaniz's offense level because – even though it was not "clearly improbable," for purposes of USSG § 2D1.1(b)(1), that Mr. Alaniz's firearms played a role in his offense – the evidence still established by preponderance that the firearms had no connection to Mr. Alaniz's drug trafficking, rendering him safety-valve eligible (SD 151)[1]; and

---

[1] In finding that Mr. Alaniz was safety-valve eligible, even though he also qualified for the 2-level gun bump under USSG § 2D1.1(b)(1), the PSR followed this Court's decision in *United States v. Nelson*, 222 F.3d 545 (9th Cir. 2000). In *Nelson*, this Court considered whether a defendant can both 1) receive the 2-level "gun bump" under § 2D1.1(b)(1) while *also* 2) qualifying for safety-valve relief pursuant to the criteria set forth in

- A 3-level offense-level reduction because Mr. Alaniz accepted responsibility by pleading guilty (SD 152).

These guidelines calculations yielded a total offense level of 15 (SD 152). That offense level then combined with Mr. Alaniz's criminal history category of I (reflecting a grand total of two minor misdemeanors which were both excluded from Mr. Alaniz's criminal history calculations by operation of USSG 4A1.2(c)(1)) to yield a guidelines range of 18-24 months (SD 152-153, 156).

---

USSG 5C1.2. The *Nelson* Court held that – even though the same *conduct* that triggers § 2D1.1(b)(1) also precludes safety-valve eligibility – a defendant can nonetheless simultaneously receive the § 2D1.1(b)(1) gun bump *and* qualify for safety valve because "the burden of proof is different for [§ 2D1.1(b)(1)] enhancement and safety valve purposes." *Id.* at 550. Under § 2D1.1(b)(1), the burden of proof requires the defendant to show that it is "clearly improbable" that firearms were possessed in connection with drug trafficking activity. *Id.* By contrast, to qualify for safety valve, a defendant need only show by "a preponderance of the evidence" that firearms were not involved in his drug-trafficking crime. *Id.* Because of these different burdens, a defendant can, as an evidentiary matter, fail to rebut the conclusion that § 2D1.1(b)(1) applies to his case while also establishing that he is eligible for safety valve relief.

**D.** **Objections to the draft PSR center on the role of firearms in calculating Mr. Alaniz's offense level, yet the government elects to introduce no historical evidence to show that USSG § 2D1.1(b)(1) is consistent with the Nation's historical tradition of firearm regulation.**

Both Mr. Alaniz and the government objected to the draft PSR's offense-level calculations. The government argued that the presence of firearms in Mr. Alaniz's home and truck precluded him from safety-valve eligibility (SD 185-189). Mr. Alaniz, for his part, contended that he was a non-prohibited-possessor who possessed firearms for purposes of hunting and sport and that there was no evidence that firearms played any role in his drug-trafficking crime. Citing the Supreme Court's decision in *Bruen*, he further explained that to enhance his punishment under USSG § 2D1.1(b)(1) for the presence of firearms would ultimately punish him for the exercise of his Second Amendment rights (SD 175-178).

A week before sentencing, the government responded to Mr. Alaniz's Second Amendment argument in a subsequent sentencing submission. The government's *Bruen* analysis ran two paragraphs, cited no historical authority, and simply stated that Mr. Alaniz was "not being punished for the exercise of his Second Amendment right to keep and

bear arms, [sic] rather, he is being punished for being a drug dealer" (ER 78).

Both Mr. Alaniz and the government elaborated on their written arguments at the sentencing hearing on August 18, 2022 (ER 13-68). The government argued that Mr. Alaniz was ineligible for safety-valve relief because of "the location of these firearms, the proximity to drug trafficking, and the types of firearms" that Mr. Alaniz possessed, which the government contended were "common" weapons among "particularly . . . Mexican drug traffickers" (ER 27). (The government introduced no evidence to support this illegitimate race-based argument, and, though of Latino descent, Mr. Alaniz is a natural born U.S. citizen (SD 154 (born in Twin Falls, Idaho).)

For his part, Mr. Alaniz rebutted the government's safety-valve arguments and pressed his objection to USSG § 2D1.1(b)(1) (ER 28-38). In pressing his § 2D1.1(b)(1) objection, Mr. Alaniz explained that his possession of a firearm, as a non-prohibited possessor, was conduct encompassed by the plain text of the Second Amendment (ER 31). And he emphasized that the government had not so much as attempted to carry its burden to show that punishing such presumptively

constitutional conduct was in keeping with historic traditions of U.S. firearm regulation. Indeed, Mr. Alaniz urged the court to "make a finding that the government did not carry its step-two [*Bruen*] burden of establishing" an historical tradition of firearm regulation that authorized application of § 2D1.1(b)(1) to Mr. Alaniz, emphasizing that the government had not so much as "attempted to meet that burden in this case" (ER 32).[2]

### E. The sentencing court rules that Mr. Alaniz is safety-valve eligible – making a finding that firearms probably played no role in his drug trafficking crime – but applies USSG § 2D1.1(b)(1).

The sentencing court ultimately found that Mr. Alaniz was safety-valve eligible – that the preponderance of the evidence supported that he did not possess firearms in connection with drug trafficking – but that USSG § 2D1.1(b)(1) nonetheless applied to Mr. Alaniz's case. In ruling on

---

[2] Even after Mr. Alaniz identified this proof problem with the government's *Bruen* argument, the government still did not attempt to carry its historical burden to show that punishing Mr. Alaniz for possessing firearms was consistent with the Nation's historic traditions of firearm regulation. Instead, it simply argued that the Second Amendment does not apply to individuals who traffic drugs, irrespective of whether they are or are not prohibited possessors and irrespective of whether there is preponderant evidence that the firearms had no connection to drug trafficking (*see* ER 39-40).

Mr. Alaniz's constitutional, *Bruen*-based objection to § 2D1.1(b)(1), the Court found that the Second Amendment's plain text covered, and thus "presumptively protect[ed]," Mr. Alaniz's conduct of possessing firearms (ER 2). But, despite the government's utter failure to introduce historical evidence in support of this conclusion, it also held that § 2D1.1(b)(1) was "consistent with the Nation's historical tradition of firearm regulation" (ER 3). It accordingly upheld application of § 2D1.1(b)(1) to Mr. Alaniz, finding that Mr. Alaniz's guidelines range was 18-24 months.

## F. The sentencing court imposes sentence and this appeal follows.

The court then considered the § 3553(a) factors, ultimately sentencing Mr. Alaniz to 15 months in prison followed by 3 years of supervised release (ER 63, 64).[3]

This appeal follows.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. On August 18, 2022, the district court overruled Mr. Alaniz's *Bruen*-based PSR objection and sentenced him to a term of 15 months (ER 2-3, 44).

---

[3] Mr. Alaniz is out of custody, but he must self-surrender to begin serving his sentence on December 4, 2022.

Mr. Alaniz then timely filed his notice of appeal. This Court has jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 1294(1).

## ARGUMENT SUMMARY

It was improper for the district court to enhance Mr. Alaniz's punishment based on the mere presence of firearms in his home and truck. People may not be punished for exercising their constitutional rights. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("[W]hile an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right."); *see also United States v. Vasquez-Landaver*, 527 F.3d 798, 805 (9th Cir. 2008) (applying this principle to the jury trial right: "a higher sentence is impermissible where the district court imposes it to punish the defendant for asserting the constitutional right to trial by jury").

In this case, Mr. Alaniz possessed firearms for reasons that the district court found were unconnected with any drug trafficking activity – as is his constitutional right. Mr. Alaniz's possession of these firearms was constitutionally protected conduct, and the government utterly failed to carry its burden, under *Bruen*, to establish that enhancing Mr. Alaniz's

punishment for drug distribution merely because he also, separately, possessed firearms is consistent with the nation's historic traditions of firearm regulation.

## ARGUMENT

### A. *Bruen*'s Second Amendment framework

In 2008, the Supreme Court held that the Second Amendment codifies a pre-existing "individual right to possess and carry weapons." *District of Columbia v. Heller*, 554 U.S. 570, 592, 624 (2008). While *Heller* recognized that the Second Amendment guarantees an individual right to keep and bear arms – and, in particular, the right "law-abiding, responsible citizens to use arms in defense of hearth and home" – it "le[ft] to future evaluation" the full scope of that right. *Id.* At 635.

After *Heller* was decided, this and other courts developed a two-step inquiry for deciding constitutional challenges. *See United States v. Chovan*, 735 F.3d 1127, 1136-38 (9th Cir. 2013) (quoting *Heller*, 554 U.S. at 635). First, courts asked if "the challenged law burdens conduct protected by the Second Amendment . . . as historically understood." *Id.* If it did, then courts next applied either strict or intermediate scrutiny depending on whether the challenged law substantially burdened the

"core" Second Amendment right of possessing firearms in defense of the home. *Id.* Both forms of scrutiny involved means-end balancing: weighing the government's interest in the regulation against the challenger's Second Amendment interests. *Bruen*, 142 S. Ct. at 2126-27.

Earlier this year, in *New York Rifle Association, Inc. v. Bruen*, the Supreme Court decisively repudiated this means-end balancing approach. *See 142 S.* Ct. at 2129-30. In its place, the Court announced a two-part test squarely rooted in the original understanding of the Second Amendment's text and effect. Under this new test, courts first ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2138, 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* at 2126, 2129-30.

Once a court finds that an individual's conduct is presumptively protected by the Second Amendment, the burden then shifts to the government to rebut this presumption. At this step, "the government may not simply posit that [a] regulation promotes an important interest" (no longer is the government's assessment of the importance of its interest pertinent to the constitutional inquiry). *Id.* at 2126. Instead, the government "must demonstrate that the regulation is consistent with

this Nation's historical tradition of firearm regulation." *Id.* at 2126. Only if the government meets this burden "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 1026.

Thus, to evaluate whether Mr. Alaniz's punishment in this case was unconstitutionally enhanced due to the presence of firearms in his home and truck, the Court must ask 1) whether the Second Amendment presumptively protects Mr. Alaniz's possession of firearms, and 2) if so, whether the government carried its burden to establish that enhancing a person's punishment simply because they possessed firearms – and despite a judicial finding that those firearms probably had nothing to do with their crime of conviction – is consistent with the Nation's historical tradition of firearm regulation. For reasons explained in the next two sections, question (1)'s answer is "yes"; question (2)'s answer is "no."

**B.** ***Bruen* step one: the Second Amendment presumptively protects Mr. Alaniz's firearms possession.**

**1.** **The Second Amendment protects each member of the national community's individual right to possess firearms.**

The district court below correctly ruled that the Second Amendment presumptively covers and protects the conduct for which Mr.

Alaniz received enhanced punishment in this case. That's because the Second Amendment right belongs to all members of the national community.

This conclusion flows directly from *Heller*. Critical to *Heller*'s decision that the Second Amendment protects an individual right to keep and bear arms was *Heller*'s interpretation of the Second Amendment's "operative clause" – the clause providing that "the right *of the people* to keep and bear arms, shall not be infringed." U.S. Const. Amend II (emphasis added).

To determine whether the Second Amendment protected an individual or collective right, *Heller* began with a "textual analysis" of the operative clause. *Heller*, 554 U.S. at 578, 579. The *Heller* Court first observed that the phrase "the right of the people" also appears in the First Amendment's Assembly-and-Petition Clause and the Fourth Amendment's Search-and-Seizure clause. *Id.* Similarly, the Ninth Amendment provides that non-enumerated "rights" are "retained by the people." *Id.* "All three of these instances," the Court ruled, "unambiguously refer to individual rights, not 'collective' rights[.]" *Id.* at 579-80. What's more, these individual rights, *Heller* ruled, apply "to all

members of the political community, not an unspecified subset." *Id.* at 580. *Heller*'s interpretation of "the people" to mean "all members of the community" is critical to *Heller*'s analysis: it explains why the Second Amendment's operative clause extends the individual right to keep and bear arms to all individuals, not just that subset who have sufficient nexus to a militia. *See id.* (reasoning that the Second Amendment's prefatory clause ("a well regulated militia being necessary to the security of a free state") does not limit the operative clause because "the people" is "a term of art employed in select parts of the Constitution" that "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community").

*Heller*'s interpretation of "the people" was integral to its reasoning and ultimate holding. And *Heller* unambiguously held that "the people" in the Second Amendment, like "the people" in the First and the Fourth Amendments, includes all members of the national community, "not an unspecified subset." *Id.* at 580. Following *Heller*, courts around the country have recognized that the Second Amendment presumptively protects the rights of every individual member of the national community

to keep and bear arms. *See, e.g.*, *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044-45 (11th Cir. 2022) ("*Heller*'s 'national community'-focused definition of 'the people' . . . finds support in Founding-era dictionaries"); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) ("the term 'the people' in the Second Amendment has the same meaning as it carries in all other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community"); *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) ("[T]he Court interpreted the word 'people' as referring to 'all Americans.' . . . Neither felons nor the mentally ill are categorically excluded from our national community."); *see also Jones v. Bonta*, 34 F.4th 704, 923 (9th Cir.), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022) ("young adults have Second Amendment protections as 'persons who are a part of a national community'").

> **2. Because Mr. Alaniz is a member of the national community, the Second Amendment presumptively protects his conduct in this case.**

Given the text of the Second Amendment, and the way in which *Heller* has cashed out "the people" to mean the class of persons who are a part of the national community, it follows that Mr. Alaniz's possession

of firearms in his home and truck is presumptively protected under the Second Amendment's plain text.

Mr. Alaniz is a part of the national community. Though the government inappropriately suggested otherwise below – implying that he was a "Mexican drug trafficker" from "south of the border" (ER 27) – that is simply false. Mr. Alaniz is a U.S. citizen and lifelong resident of Idaho (SD 154); the Second Amendment accordingly protects his individual right to possess firearms.

Not only is Mr. Alaniz one of the people the Second Amendment protects, but that amendment also plainly extends to the conduct in this case. Before the district court, Mr. Alaniz presented abundant evidence showing that he possessed firearms solely for lawful purposes, such as hunting and sport (SD 164-178). The district court then, after hearing this evidence, specifically found that Mr. Alaniz's firearms were unconnected to his drug trafficking activity, applying this Court's decision in *United States v. Nelson,* 222 F.3d 545 (9th Cir. 2000), to rule that Mr. Alaniz was safety-valve eligible (ER 43 (noting the "differing standards" that apply to safety-valve versus § 2D1.1(b)(1) in ruling that Mr. Alaniz was safety-valve eligible). Possessing firearms in the home is

core Second Amendment activity, and the district court in this case made an express finding, by preponderance of the evidence, that Mr. Alaniz's firearm possession had nothing to do with his criminal conduct. The court accordingly enhanced Mr. Alaniz's punishment in this case due solely to 1) the proximity of guns and drugs and 2) the court's finding that, even though Mr. Alaniz *probably* did not possess firearms in connection with drug trafficking, it was not "*clearly improbable*" that those guns were possessed in connection with that offense.

As the district court here found, the Second Amendment presumptively protects Mr. Alaniz's firearm possession in this case. It is therefore presumptively unconstitutional to enhance his punishment because he possessed firearms. *See Bruen,* 142 S. Ct. at 2126, 2129-30.

///
///
///
///
///
///
///
///
///
///

**C.    The government utterly failed to carry its burden to show that punishing Mr. Alaniz for possessing firearms in this case is consistent with the Nation's historical traditions of firearm regulation.**

**1. The government's utter failure to adduce evidence or argument supporting the conclusion that applying USSG § 2D1.1(b)(1) to Mr. Alaniz is consistent with the Nation's historical traditions of firearm regulation is fatal.**

Under *Bruen*, once it's established that the Second Amendment presumptively protects an individual's conduct, the burden then shifts to the government to "justify [any] regulation" of that conduct "by demonstrating that it is consistent with the Nation's historical traditions of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30.

Importantly, the showing the government must make at *Bruen*'s step two is a fact-intensive showing. The *Bruen* Court repeatedly emphasized that it is the government's burden to adduce "historical evidence" to sustain its regulation. *Bruen*, 142 S. Ct. at 2130. It also analogized the government's evidentiary burden at step two to the burden – which is factual – that applies where the state seeks to justify a restriction on speech. *See id.* (analogizing the Second Amendment to the First Amendment, where "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its

actions" (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000)). Courts recognize that the government's step-two burden is factual in nature. *See* Order*, United States v. Bullock*, 3:18-cr-165, ECF No. 65 (S.D. Miss. Oct. 27, 2022) (proposing court needs expert testimony to determine the Nation's historic traditions of firearm regulation). At minimum, the government must adduce *some* historical evidence and argument to carry its burden at step two.

Here, however, the government introduced no such materials. Indeed, the government did not so much as cite a *single* case or other piece of historical evidence tending to show or suggest that apply § 2D1.1(b)(1) to a person in Mr. Alaniz's shoes is consistent with the Nation's historical traditions of firearm regulation (ER 78-79).

This failure alone is fatal to any attempt the government might now make to show that applying § 2D1.1(b)(1) to Mr. Alaniz is consistent with the Nation's historical traditions of firearm regulation. Three considerations support this conclusion.

***First***, in the First Amendment context – which *Bruen* itself recognizes is analogous to the Second Amendment context – courts do not hesitate to strike speech-restrictive laws when the government fails at

the trial court level to prove, as an evidentiary matter, that they are justified. *See, e.g.*, *Annex Books, Inc. v. Indianapolis*, 740 F.3d 1136, (7th Cir. 2014) (reversing district court's decision upholding restriction on hours adult bookstores can be open because Indianapolis's evidence supporting that restriction was "weak"). That same principle applies in this case; where the government utterly fails to adduce evidence or argument before the trial court supporting the conclusion that § 2D1.1(b)(1) is consistent with the Nation's historical traditions of firearm regulation, that evidentiary failure is fatal to any argument the government might belatedly seek to press on appeal.

**Second**, this result likewise follows from the basic principle requiring parties to present their arguments to the district court in the first instance. *See Bruen*, 142 S. Ct. at 2130 n.6 ("[i]n our adversarial system of adjudication, we follow the principle of party presentation" meaning that courts "decide a case based on the historical record *compiled by the parties*" (emphasis added) (alteration in original)). Under this principle, the parties "are responsible for advancing facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003)

(Scalia, J., concurring in part and concurring in judgment). The parties bear this responsibility not just "on appeal," but also "in the first instance" – i.e., before the district court. *Id.* And the principle of party presentation carries particular force when applied to the United States, "the richest, most powerful, and best represented litigant to appear before" the federal courts. *Id.* (citing *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (R. Arnold, J., concurring in denial of rehearing en banc).

The government below elected not to argue that § 2D1.1(b)(1) is consistent with the Nation's historical traditions of firearm regulation – deciding, instead, to argue that it simply doesn't implicate any constitutional concerns whatsoever. The government must bear responsibility for that choice.

***Finally***, the fatality of the government's failure to make any *Bruen* step-two arguments before the district court also follows from *Bruen* itself, which emphasized that it was "*respondent's burden*" – i.e., the government's burden, not the individual's or the Court's – "to sift the historical materials for evidence to sustain" the imposition of legal burdens on protected Second Amendment activity. *Bruen*, 142 S. Ct. at

2150 (emphasis added). The government shirked that burden before the district court, attempting to leave it up to Mr. Alaniz to identify the *absence* of historical traditions supporting the lawfulness of applying § 2D1.1(b)(1) to his circumstances. The right result, instead, is to hold the government to its choice below not to introduce evidence or argument supporting the conclusion that § 2D1.1(b)(1) is consistent with the Nation's historical traditions of firearm regulation.

> **2. The district court's order fails to show that applying § 2D1.1(b)(1) to Mr. Alaniz is consistent with the Nation's historical traditions of firearm regulation.**

Nor can the government rely on the work the district court did, below, to shore up the government's position. In reaching the conclusion that applying USSG § 2D1.1(b)(1) to Mr. Alaniz is consistent with the Nation's historic traditions of firearm regulation, the district court primarily relied on *United States v. Moreno*, an unpublished, out of circuit, pre-*Bruen* decision that declared "[i]t goes without saying that the historical traditions associated with the Second Amendment do not include ensuring admittedly-guilty-drug-offense conspirators' sentences are not enhanced when they have possessed firearms during activities related to their offense" (ER 4 (citing 811 F. App'x 219 (5th Cir. 2020)).

But this case, which applied a legal framework for analyzing Second Amendment claims that *Bruen* has since repudiated, is wholly inapposite.

To fully see why requires a brief overview of *Bruen*'s methodology for evaluating whether the government has born its burden to show that a restriction on firearm possession is consistent with the Nation's historic traditions of firearm regulation. Depending on the nature of the regulation at issue, the government must bear this burden in just one of two ways.

***First***, if the regulation addresses "a general societal problem that has persisted since the 18th century," *Bruen*, 142 S. Ct. at 2131, then, to save that regulation, the government must identify a "distinctly similar" historical regulation. *Id.* If the government fails to do this, then this constitutes evidence that the challenged regulation violates the Second Amendment. *Id.* Moreover, if earlier generations addressed the societal problem through "materially different means," then that, too, constitutes evidence of the challenged regulation's unconstitutionality. *Id.* So too does any evidence of failed historical efforts to enact analogous regulations. *Id.*

**Second,** if – but only if – the challenged regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," then the government may engage in "reasoning by analogy" to support the challenged regulation. *Id.* at 2132. The only regulations susceptible to this "more nuanced approach" are those "modern regulations that were unimaginable at the founding." *Id.* When one of these regulations is at issue, the government's burden is to identify "relevantly similar" historical regulations – a task requiring comparison of how and why the regulations burden the Second Amendment right. *Id.* at 2132-33. This analogical reasoning is "neither a regulatory straightjacket nor a regulatory blank check" but it requires the government to "identify a well-established and representative historical analogue." *Id.* at 2133.

*United States v. Moreno* – the Fifth Circuit case relied on by the district court – pursued neither one of these strategies. *Moreno* did not require the government to produce evidence of a "distinctly similar" historical regulation to USSG § 2D1.1(b)(1) in order to establish that the provision was consistent with the Nation's historic traditions of firearm regulation. It did not even require the government to reason by analogy (a form of reasoning that, because § 2D1.1(b)(1) does not implicate

"unprecedented societal concerns or dramatic technological changes," is, in any event, illegitimate under *Bruen*). Indeed, at the time *Moreno* was decided, the standard the Fifth Circuit used to assess the constitutionality of a firearm regulation flipped the *Bruen* standard on its head. When *Moreno* was decided, the Fifth Circuit would uphold an otherwise "reasonable" firearm restriction so long as it was "not inconsistent with the right of Americans generally to keep and bear their private arms as historically understood in this country." 811 F. App'x at 224 (quoting *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001)). This standard would uphold a restriction on firearm possession so long as there is no indication that the restriction is inconsistent with the Second Amendment right. By contrast, under *Bruen*, a restriction will be struck unless it is affirmatively consistent with the Nation's historic traditions of firearm regulation.[4]

---

[4] Additionally, when *Moreno* was decided, the Fifth Circuit looked to an overbroad array of historical materials to evaluate whether a firearm regulation withstood Second Amendment scrutiny. *Compare National Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, and Firearms*, 700 F.3d 185, 194 (5th Cir. 2012) (explaining that courts in Fifth Circuit were to look at "wide-ranging materials, including late 19th- and early 20th-century cases" to decide whether a challenged law "harmonizes with the historical traditions associated with the Second Amendment guarantee"), *with Bruen*, 142 S. Ct. at 2137 ("The belated innovations of the mid- to

The other cases cited by the district court to shore up the government's evidentiary deficiencies in this case are equally inapposite. *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012), which *Bruen* expressly abrogated, did not apply the "distinctly similar" regulation test and drew on an overbroad welter of historical sources, including those from the late-nineteenth century, to conclude that the conduct punished by § 2D1.1(b)(1) fell outside the scope of the Second Amendment.

*Greeno* also considered an importantly different issue from the issue in this case. *Greeno* upheld § 2D1.1(b)(1) against a challenge arguing that the Second Amendment protected the right to "possess[] . . . weapons *for unlawful purposes*." 679 F.3d at 520 (emphasis added). In this case, however, the district court found by a preponderance of the evidence that Mr. Alaniz *did not* possess firearms in connection with drug trafficking (ER 44). The government's burden in this case was accordingly to show that enhancing a person's punishment for drug distribution because they *just so happened to own firearms* – even though the firearms played no role in their drug trafficking crime – was

---

late-19th century courts come too late to provide insight into the meaning of [the Constitution in 1787]" (quotation omitted)). This is another way in which *Moreno*'s conclusions are inapposite to a post-*Bruen* world.

consistent with the Nation's historic traditions of firearm regulation. Not only does *Greeno* fail to help make this case, but the sources it cites all strongly suggest that, around the time of the founding, individuals could receive enhanced punishment for possessing firearms only if the government proved that they used those firearms in connection with a violent offense. *See id.* at 520 (citing *Commonwealth v. Hope*, 39 Mass 1 (Mass. 1839) & *United States v. Bernard*, 24 F. Cas. 1131 (C.C.D.N.J. 1819) (two cases describing statutory schemes that enhanced defendants' punishment for using firearms to perpetrate violence)).

The remaining cases cited by the district court, *United States v. Napolitan*, 762 F.3d 297 (3d Cir. 2014) and *United States v. Potter*, 630 F.3d 1260 (9th Cir. 2011), are similarly inapposite; they do not apply *Bruen*'s test and they consider an importantly different set of facts than those at issue here.

Because the government made no attempt to carry its burden under *Bruen*'s step two to establish that enhancing Mr. Alaniz's punishment was consistent with Nation's historic traditions of firearm regulation, and because none of the decisions cited by the district court support this result either, the government has failed to carry its step-two burden

under *Bruen*, and it follows that the district court's upholding the constitutionality of applying § 2D1.1(b)(1) to Mr. Alaniz must be reversed.

## <u>CONCLUSION</u>

The district court's decision enhancing Mr. Alaniz's punishment for drug trafficking because firearms were found in his home and truck – even though preponderant evidence established that firearms played no role in Mr. Alaniz's drug trafficking offense – must be reversed. Respectfully submitted this 21st day of November, 2022.

<u>/s/ Miles Pope</u>
Miles Pope
Assistant Federal Defender
Federal Defender Services of Idaho
Attorneys for Defendant-Appellant
MIGUEL MICHAEL ALANIZ

## <u>STATEMENT OF RELATED CASES</u>

Counsel for Defendant-Appellant MIGUEL MICHAEL ALANIZ is

not aware of any related cases currently pending in this Court.

## <u>CERTIFICATE OF COMPLIANCE</u>

I am the attorney. **This brief contains 5873 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. 32(a)(5) and (6).

I certify that this brief (*select only one*):

[X]    complies with the word limit of Cir. R. 32.1.

[ ]    is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ]    is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ]    is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ]    complies with the longer length limit permitted by Cir. R. 32-2(b) because (*select only one*):

    [ ]    it is a joint brief submitted by separately represented parties;

    [ ]    a party or parties are filing a single brief in response to multiple briefs; or

    [ ]    a party or parties are filing a single brief in response to a longer joint brief.

[ ]    complies with the length limit designated by court order dated _____.

[ ]    is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated: November 21, 2022    /s/ Miles Pope
    Miles Pope
    Assistant Federal Defender
    Federal Defender Services of Idaho
    Attorneys for Defendant Appellant
    MIGUEL MICHAEL ALANIZ

## **CERTIFICATE OF SERVICE**

1.     I hereby certify that on November 21, 2022, I electronically filed the foregoing Defendant-Appellant's OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

2.     I hereby certify that on November 21, 2022, I electronically served the foregoing Defendant-Appellant's OPENING BRIEF on counsel for Plaintiff-Appellee, Christopher Booker, Assistant United States Attorney, via the United States Court of Appeals CM/ECF electronic filing system.

3.     I hereby certify that on November 21, 2022, I mailed the foregoing Defendant-Appellant's OPENING BRIEF to MIGUEL MICHAEL ALANIZ via the United States Postal Service by first class postage prepaid.

Dated:  November 21, 2022          /s/ Joy Fish
                                                        Joy Fish