U.S.C.A. No. 22-30141

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff/Appellee,

vs.

MIGUEL MICHAEL ALANIZ,

        Defendant/Appellant.

## GOVERNMENT'S ANSWERING BRIEF

On Appeal from the United States District Court
for the District of Idaho
District Court No. 1:21-cr-00243-BLW
The Honorable B. Lynn Winmill, Senior District Court Judge

JOSHUA D. HURWIT
United States Attorney
CHRISTOPHER A. BOOKER &
SYRENA C. HARGROVE
Assistant United States Attorneys
District of Idaho
1290 W. Myrtle St., Suite 500
Boise, ID 83702-7788
Telephone: (208) 334-1211
Attorney for Plaintiff/Appellee
United States of America

Miles Pope
Federal Defender Services of
Idaho
702 W. Idaho St., Suite 1000
Boise, ID 83702
Telephone: (208) 371-5500
Attorney for Defendant/Appellant
Miguel Michael Alaniz

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................i

TABLE OF AUTHORITIES ........................................................ iii

JURISDICTION, TIMELINESS, AND BAIL STATUS............................1

ISSUES PRESENTED ...................................................................1

    1.    Is United States Sentencing Guideline Section 2D1.1(b)(1) presumptively constitutional because it solely regulates a class of people—felony drug traffickers—engaged in unlawful activity, neither of which the Second Amendment protects? ...............................1

    2.    If the Guideline does somehow burden Second Amendment rights, does its incremental penalty for the possession of a dangerous weapon during criminal activity comport with historical tradition? ............................1

STATEMENT OF THE CASE ..........................................................2

SUMMARY OF ARGUMENT ...........................................................6

STANDARDS OF REVIEW .............................................................7

ARGUMENT ..............................................................................7

I.    Two of the three questions comprising *Bruen*'s first step inquiry establish that Section 2D1.1(b)(1) does not burden Second Amendment rights at all.  It regulates only non-law-abiding citizens and the unlawful use of weapons.....................................10

    A.    Felony drug traffickers are not part of "the people" whom the Second Amendment protects.  Thus, the answer to *Bruen*'s first question establishes that Section 2D1.1(b)(1) does not burden Second Amendment rights at all........................................11

B.     Possessing a weapon during criminal conduct, which imposes a greater danger on society, is not conduct protected by the Second Amendment.  Thus, *Bruen*'s third question supports presumptive constitutionality as well. ...................................................................17

C.     While not definitive, the nature of several of the firearms in this case also tends to support the constitutionality of Section 2D1.1(b)(1) as applied to this Defendant.  Thus, Bruen's remaining question offers some support as well.....................................................21

II.     Section 2D1.1(b)(1)'s incremental penalty for the increased risk posed by possessing a dangerous weapon during criminal conduct is well in line with historical tradition..........................................24

CONCLUSION .........................................................................30

Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6 ....................................................................31

Form 8. Certificate of Compliance for Briefs .........................................32

# TABLE OF AUTHORITIES

Page(s)

Cases

*Binderup v. Attorney General of United States*, 836 F.3d 336 (3d Cir. 2016) ............................................................................. 22

*Commonwealth v. Hope*, 39 Mass. 1, 22 Pick. 1 (Mass. 1839) ................ 27

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................ passim

*Gonzales v. Raich*, 545 U.S. 1 (2005) ....................................... 26

*Hernandez v. Garland*, 47 F. 4th 908 (9th Cir. 2022) ............................. 7

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) .................................. 7, 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ......................................................................... passim

*People v. Rockhill*, 26 N.Y.S. 222 (N.Y. 1893) .................................... 29

*State v. Alexander*, 56 Mo. 131 (1874) ......................................... 28

*State v. Cash*, 16 P. 144 (Kan. 1887) .......................................... 29

*State v. Huntly*, 25 N.C. 418, 3 Ired. 418 (1843) ................................ 28

*State v. O'Neil*, 71 Minn. 399 (Minn. 1898) .................................... 29

*State v. Tutt*, 63 Mo. 595 (Mo. 1876) .......................................... 29

*State v. Young*, 345 Mo. 407 (1939) ........................................... 28

*United States v. Baldon*, 956 F.3d 1115 (9th Cir. 2020) ......................... 18

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) ........................... 22

*United States v. Bernard*, 24 F. Cas. 1131 (C.C.D.N.J. 1819) ................... 29

iii

*United States v. Daniels*, 2022 WL 2654232 (S.D. Miss. Jul. 8, 2022)...15

*United States v. Goodlow*, 389 F. App'x 961 (11th Cir. 2010) ...............20

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) .................. passim

*United States v. Heldberg*, 907 F.2d 91 (9th Cir. 1990) .........................10

*United States v. Jackson*, 555 F.3d 635 (7th Cir. 2009).........................22

*United States v. Jacobson*, 406 F. App'x 91 (8th Cir. 2011) ..................20

*United States v. Lopez-Sandoval*, 146 F.3d 712 (9th Cir. 1998)............22

*United States v. Moreno*, 811 F. App'x 219 (5th Cir. 2020) ....6, 13, 19, 20

*United States v. Napolitan*, 762 F.3d 297 (3d Cir. 2014)...........13, 19, 20

*United States v. Nelson*, 222 F.3d 545 (9th Cir. 2000)...........................18

*United States v. Perez-Garcia*, Case No. 3:22-CR-01881-GPC, 2022 WL 4351967 (S.D. Cal. Sept. 18, 2022) .....................................................15

*United States v. Potter*, 630 F.3d 1260 (9th Cir. 2011) ..........................21

*United States v. Riley*, 359 F. App'x 402 (4th Cir. 2010) .......................20

*United States v. Ruiz*, 621 F.3d 390 (5th Cir. 2010) ..............................20

*United States v. Stewart*, 926 F.2d 899 (9th Cir. 1991) .........................22

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010).......7, 11, 12, 16

*Young v. Hawaii*, 142 S. Ct. 2895 (2022)..................................................8

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021)........................................8

Constitutions and Statutes

U.S. Const. amend. II ........................................................................ passim

18 U.S.C. § 921(g) ..............................................................................12, 14

18 U.S.C. § 922(g) ..................................................................13, 14, 15, 16

iv

18 U.S.C. § 924(c) ............................................................................... 15

18 U.S.C. § 3231 ..................................................................................... 1

28 U.S.C. § 1291 ..................................................................................... 1

Rules

Fed. R. App. P. 4(b) .............................................................................. 1

USSG Ch. 1 .......................................................................................... 29

USSG § 2D1.1(b)(1) ..................................................................... passim

USSG § 5C1.2 ................................................................................. 5, 18

Other Authorities

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ... 28

Margarta Mercado Echegaray, *Drug Prohibition in Am.: Fed'l Drug Policy and its Consequences*, 75 Rev. Jur. U.P.R. 1215 (2006) .......... 26

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231.  This Court maintains jurisdiction pursuant to 28 U.S.C. § 1291.

The district court entered its judgment on August 18, 2022. (Excerpts of Record ("ER") ER-6-12.)  The Defendant-Appellant Miguel Michael Alaniz timely filed a notice of appeal on August 22, 2022.  (ER 131-33); Fed. R. App. P. 4(b).

Alaniz is currently incarcerated at the Federal Correction Institution Englewood in Littleton, Colorado.  His projected release date is December 16, 2023.

## ISSUES PRESENTED

1. **Is United States Sentencing Guideline Section 2D1.1(b)(1) presumptively constitutional because it solely regulates a class of people—felony drug traffickers—engaged in unlawful activity, neither of which the Second Amendment protects?**

2. **If the Guideline does somehow burden Second Amendment rights, does its incremental penalty for the possession of a dangerous weapon during criminal activity comport with historical tradition?**

## STATEMENT OF THE CASE

In this criminal case, the Defendant challenges his sentence. Specifically, he asserts that United States Sentencing Guideline Section 2D1.1(b)(1) is unconstitutional.

The Defendant pleaded guilty without a plea agreement to three counts of cocaine distribution and one count of possession with intent to distribute cocaine.  (ER-100-24.)  At sentencing, the Guidelines' application to the facts was contested, but the facts were not.

As the Pre-Sentence Report (PSR) explained and the district court found, *see* (ER-58), a year-long investigation by the Idaho State Police had revealed that the Defendant was traveling to Las Vegas to obtain large amounts of cocaine, which he was then distributing in Idaho. (Sealed Documents filed by the Defendant in this appeal (SD)-149; ER 59-60, 71.)  A confidential informant then bought drugs from the Defendant three times.  (ER-21-23, 40-41, 71-73; SD-149, 190-193.)  The Defendant left the drugs in a pickup truck in his driveway, concealed inside an item like a fast-food bag or Pop Tarts box on the front seat. (ER-21-23, 40-41, 71-72; SD-192.)  During the second transaction, the

two also met inside the Defendant's home. There, with children present, they discussed future deals. (ER-48, 51-52, 61-62; SD-192.)

Just after the last drug transaction with the confidential informant, police stopped the Defendant. He had a loaded handgun with him in his car. (ER-21-23, 40-41, 72; SD-149, 205-206.)

Officers obtained a search warrant to search the Defendant's home and found eleven additional firearms. One hunting rifle was behind the couch in the Defendant's living room. (SD-201.) The remaining guns were in his bedroom. These included the three AR-15 rifles and an AK-47 rifle pictured below. (Government's Supplemental Sealed Excerpts of Record 1-SER 3-6; ER-23, 41; SD-201-202.)



On the wall in the Defendant's dining room, police also observed pictures of violent drug traffickers including Pablo Escobar and El

Chapo.[1] (ER-49, 60-61,73; 2-SER-13.)  Finally, the search revealed a large amount of cocaine in a safe in the kitchen, along with a drug scale. Another scale with white powdery residue was found in the bedroom. (ER-21-23, 41, 72-73; SD-150, 201-202; 2-SER-13.)

At sentencing, the Defendant argued it was "clearly improbable that the firearm was possessed in connection with drug-trafficking activity" and that he therefore satisfied Section 2D1.1(b)(1)'s exception. (ER-35-38 (referring to USSG § 2D1.1(b)(1), cmt. n.11(A)).)  In support, he offered evidence that he was a hunter.  (SD-162-82.)  The Government pointed out that the AK-47 and the AR-15s he possessed were associated with drug cartels and drug trafficking, *see* (ER 23, 27), and the district court specifically noted that they were not typical hunting weapons, but more like assault rifles.  *See* (ER 41-43.) Moreover, they were located in the same room as drug scales and cocaine.  (ER-43.)  Thus, the court concluded that the two-level enhancement under Section 2D1.1(b)(1) did apply.  (*Id.*)

---

[1] The Defendant apparently sought to emulate Pablo Escobar, telling his wife on a jail call that he had been "smiling like Pablo Escobar" when detectives had taken his booking photo.  (1-SER-2; ER-49, 61, 73.)

The court, however, granted a two-level decrease to the Defendant under Section 5C1.2(a)(2), finding that he had demonstrated, by a preponderance of the evidence, that the guns were not connected to the offenses charged.  (*Id*.)  The court noted that it was a "close call," but held that the safety valve should apply.  (ER-44.)

The court then rejected the Defendant's constitutional challenge to Section 2D1.1(b)(1).  Citing out-of-Circuit precedent, the district court reasoned that the Second Amendment had no "bearing on the application of the guideline enhancement" because it simply did "not include the right to use a firearm in some way that is tried to drug trafficking, whether it's simply possessing it or whether it's actually used in connection with drug trafficking."  *See* (ER-46; *see also* ER-3-4.)[2] The court explained that "there is no historical precedent" for using firearms in connection with trafficking *cocaine*, in particular.  But "historical traditions associated with the Second Amendment do not include ensuring admittedly guilty drug offense conspirator sentences are not enhanced when the[y] possess firearms during activities related

---

[2]       Although the court expressly relied on *Bruen*'s historical analogue inquiry, the second prong, some of its reasoning is in accord with first prong analysis.  *See* (ER-3-5, 45-46.)

to their offenses," the court held.  *See* (ER-45-46 (referring to the Fifth Circuit's analysis in *United States v. Moreno*, 811 F. App'x 219, 224 (5th Cir. 2020) (per curiam)); *see also* (ER-3.)  The court then sentenced the Defendant to a below-Guideline sentence of 15 months.  *See* (ER-63.) This timely appeal followed.

## SUMMARY OF ARGUMENT

Section 2D1.1(b)(1) increases a drug dealer's felony sentence if he possessed a dangerous weapon at the time of his crime.  *Bruen's* first prong inquiry, with its three questions, establishes that this Guideline does not burden Second Amendment rights at all.  It affects only serious criminals, who lack Second Amendment rights in the first place.  And it penalizes only the unlawful use of weapons, which is conduct that also lacks protection under the Second Amendment.

Because Section 2D1.1(b)(1) does not burden Second Amendment rights at all, this Court need not proceed to the examination of historical analogues that *Bruen* prescribed.  If it chooses to do so, however, the existence of strong historical analogues also supports constitutionality.  Particularly dangerous behavior during criminal activity—specifically including the possession of a firearm—has

6

justified greater punishment for centuries. Thus, even if the Guideline somehow burdens Second Amendment rights, that burden comports with historical tradition.

## STANDARDS OF REVIEW

The constitutionality of a statute receives de novo review. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010). "[C]onstitutional challenges to a district court's denial of a motion to dismiss" are also reviewed de novo. *Id.*

Determining whether Supreme Court precedent abrogates or undermines a three-judge panel's reasoning is a question of law and should be addressed de novo. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (describing legal analysis required), *overruled on different grounds as recognized in Hernandez v. Garland*, 47 F. 4th 908, 910 (9th Cir. 2022).

## ARGUMENT

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122.

7

After *District of Columbia v. Heller*, 554 U.S. 570 (2008), courts of appeals, including the Ninth Circuit, had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 2125, 2127 n.4 (collecting circuit cases, including *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), which was vacated and remanded in light of *Bruen*, *see Young v. Hawaii*, 142 S. Ct. 2895 (2022)).

*Bruen* largely affirmed the first step inquiry adopted by the Circuits as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. That said, as it engaged in its own analysis, it clarified the first step with three questions.

First, it asked whether those regulated by the provision were "part of 'the people' whom the Second Amendment protects." *Id.* at 2135. That is, it asked whether they were "law-abiding citizens." *Id.* Second, it asked whether the guns regulated "are weapons in common use today" for lawful purposes—in that case, "self-defense." *Id.* Third, it asked whether the Second Amendment covered the parties' "proposed course of conduct" which, in that case, involved "carrying handguns

8

publicly for self-defense." *Id.* at 2119. All three questions in *Bruen* established that the New York law burdened Second Amendment rights. Accordingly, the Court had to determine if that burden was permissible and it proceeded to the next step.

*Bruen* expressly abrogated the second steps adopted by the Circuits. *Id.* at 2127 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.") Instead of means-end scrutiny, courts must examine historical analogues to determine if the modern "regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

The *Bruen* Court emphasized that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. The government cannot rely on historical analogies outside the mainstream—"outliers." *Id.* That said, only a "representative historical *analogue*" is required, not "a historical *twin*." *Id.* Thus, "modern regulations that were unimaginable at the founding" may still be analogous to historical regulations and may therefore still be constitutional. *Id.* at 2132.

I. **Two of the three questions comprising *Bruen*'s first step inquiry establish that Section 2D1.1(b)(1) does not burden Second Amendment rights at all. It regulates only non-law-abiding citizens and the unlawful use of weapons.**

Section 2D1.1(b)(1) increases a felony drug trafficker's sentence if "a dangerous weapon was possessed" during the course of criminal conduct and it is not "clearly improbable that the weapon was connected with the offense." USSG § 2D1.1(b)(1), and cmt. n.11(A) (2018). Commentary explains, and precedent elaborates on, "the increased danger of violence when drug traffickers possess weapons." USSG § 2D1.1(b)(1), cmt. n.11; *see United States v. Heldberg*, 907 F.2d 91, 94 (9th Cir. 1990) (detailing commonly known reasons drug traffickers possess weapons, and the dangers such possession entails). Thus, Section 2D1.1(b)(1) penalizes drug traffickers who possess weapons during their offense, recognizing that, even if they did not affirmatively use the weapon during the offense, their ready access to it increased the risk of unlawful violence. Two of the three questions *Bruen* asked in its first prong inquiry, *see Bruen*, 142 S. Ct. at 2134-35, independently establish the presumptive constitutionality of the Guideline in this case. The remaining question supports constitutionality as well.

10

A. **Felony drug traffickers are not part of "the people" whom the Second Amendment protects. Thus, the answer to *Bruen*'s first question establishes that Section 2D1.1(b)(1) does not burden Second Amendment rights at all.**

The first question *Bruen* asked—whether the regulated parties are "part of 'the people'" whose rights the Second Amendment protected—is determinative in this case. *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580). As soon as the Defendant began engaging in unlawful activity, transporting large amounts of illegal drugs and distributing them in Idaho, he placed himself outside the class of law-abiding citizens whom the Second Amendment protects. *Bruen*, 142 S. Ct. at 2122, 2131-35 and n.8, 2138, 2150 (describing the Second Amendment's protection of "ordinary, law-abiding citizens"); *Heller*, 554 U.S. at 579-81; *see United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (rejecting argument that longstanding exclusion of felons from the class protected by the Second Amendment was merely dicta in *Heller* that need not be followed). There is no dispute that the Defendant was not a law-abiding citizen.

The Second Amendment was never designed to protect criminals. *See Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).

11

Both the majority opinion and a concurrence in *Bruen* emphasized this when they addressed "shall-issue" licensing regimes. Such regimes exclude those who fall within a prohibited class from bearing arms entirely and ensure that "those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *See Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). *Id.* And such regimes are, according to the majority opinion and Justice Kavanaugh's concurrence, constitutionally permissible. *See id.; id.* at 2162 (Kavanaugh, J., concurring). The Second Amendment protects only law-abiding citizens.

The Ninth Circuit has also recognized, after *Heller*, that those who have committed felonies "are categorically different from the individuals who have a fundamental right to bear arms." *See Vongxay*, 594 F.3d at 1115. Their criminality places them outside the circle of "law-abiding citizens" the Second Amendment protects. *Id.* For that reason, the court upheld 18 U.S.C. § 921(g)(1)'s categorical disarming of this class of people in an as-applied challenge. *Id.* at 1115-18. *Vongxay*'s first prong analysis does not conflict with *Bruen*, and it remains good law. *See Miller*, 335 F.3d at 900. It controls here.

In published opinions, two Circuits have already held Section 2D1.1(b)(1) presumptively constitutional in first prong analyses. *See United States v. Napolitan*, 762 F.3d 297, 311 (3d Cir. 2014); *see also United States v. Greeno*, 679 F.3d 510, 517 (6th Cir. 2012), *abrogated on other grounds by Bruen, but cited for its first prong analysis*, 142 S. Ct. 2126. They emphasized that Second Amendment protections cover only "law-abiding, responsible citizens." *Greeno*, 679 F.3d at 517 (quoting *Heller*, 554 U.S. at 635 (internal quotation marks omitted)). The Sixth Circuit specifically explained: "The core right recognized in *Heller* is the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.*

In a well-reasoned, but unpublished, disposition affirming the constitutionality of Section 2D1.1(b)(1), the Fifth Circuit even more directly relied on the defendant's membership in a prohibited class when it upheld Section 2D1.1(b)(1). *See Moreno*, 811 F. App'x at 224. The disposition noted that "drug traffickers pose a risk to society that is enhanced by their possessing firearms," and analogized to Fifth Circuit precedent that approved § 922(g)(3)'s prohibition on drug abusers

13

possessing arms. *Id.* Drug abusers, like felons, have no Second Amendment rights. *Id.*

The Defendant makes much of the fact that he was not, at the time of his weapon possession and drug trafficking, an *adjudicated* felon. *See* (AOB at 1.) He could not prospectively have been deprived of his weapons under § 922(g)(1), to be sure. But that does not establish that he was a person who was affirmatively protected by the Second Amendment. *Contra* (*id.* at 14-19.) He was not. Indeed, no one penalized by Section 2D1.1(b)(1), which solely applies to those engaged in felony drug trafficking, was protected by the Second Amendment at the time of their conduct.

In addition, being *adjudicated* a member of a certain class is not always required even for prospective bars. For example, § 922(g)(3), which prohibits illegal drug users and addicts from bearing weapons, requires no adjudication whatsoever before prospectively prohibiting that class of people from bearing arms. *See* 18 U.S.C. § 922(g)(3). As with Section 2D1.1(b)(1), those engaging in the activity that places them outside the Second Amendment's protections are well aware of what they are doing, and of their belonging in the relevant class.

14

Section 922(g)(3) has been affirmed after *Bruen* by at least one district court. *See United States v. Daniels*, 2022 WL 2654232 (S.D. Miss. Jul. 8, 2022). Likewise, § 924(c) penalizes all who use, carry, or possess a gun in furtherance of a crime of violence or drug trafficking crime, whether or not they have been adjudicated criminals previously. *See* 18 U.S.C. § 924(c)(1)(A).[3]

If anything, the more complete, prospective prohibitions that § 922(g) places on entire classes of people, like felons, illegal drug users, and the mentally ill, are more drastic than the retrospective, incremental punishment imposed by Section 2D1.1(b)(1). Section 2D1.1(b)(1) penalizes possession of firearms during a precise time frame: the period of criminal activity in which the weapon was possessed. It penalizes a small class of serious criminals (drug traffickers), who present special danger when they have firearms readily available. And it even excepts defendants who, although

---

[3]     Merely being charged with a crime places someone outside the class of "ordinary, law-abiding citizens," and allows for a prospective ban on firearms, among other restrictions. *See United States v. Perez-Garcia*, Case No. 3:22-CR-01581-GPC, 2022 WL 4351967, *5 (S.D. Cal. Sept. 18, 2022) (collecting cases describing acceptable restrictions on rights after criminal charges are brought).

15

admittedly felony drug traffickers who possessed a weapon during their criminal activity, can establish that it is clearly improbable that the weapon was connected to their criminal conduct. *See* USSG § 2D1.1(b)(1), cmt. n.11. In contrast, § 922(g)(1) prohibits all firearm possession after someone has been adjudicated a felon, and other provisions prohibit all possession based on membership in other classes, like being an illegal drug user or addict. *See, e.g.*, 18 U.S.C. § 922(g)(3).

Section 2D1.1(b)(1) does not implicate the Second Amendment at all. It penalizes the possession of weapons by a class of people, those committing felony drug trafficking offenses, that has no Second Amendment rights under the law of this Circuit and as explained by the majority and a concurrence in *Bruen*. *See Vongxay*, 594 F.3d at 1118; *Bruen*, 2138 n.9 and 2162. Moreover, the Guideline is narrower than prohibitions, like § 922(g)(1), that have already been held constitutional and that bind this Court's inquiry. *Vongxay*, 594 F.3d at 1118.

The Guideline is presumptively constitutional on this basis alone, and the Court need proceed no further. In the interest of thoroughness, however, this brief will continue its first prong analysis using *Bruen's* remaining two questions.

16

**B.**  **Possessing a weapon during criminal conduct, thereby imposing greater danger on society, is not conduct protected by the Second Amendment.  Thus, *Bruen*'s third question supports presumptive constitutionality as well.**

Because the "ordinary, law-abiding, adult citizens" in *Bruen* were indisputably "part of 'the people' whom the Second Amendment protects," the *Bruen* Court had to proceed to the next question in its first prong analysis. *Bruen*, 142 S. Ct. at 2134.  In this case, the Court need not do so.  The categorical exclusion of felons from the protections of the Second Amendment is sufficient to find Section 2D1.1(b)(1) presumptively constitutional.  *Bruen's* third question, however, provides an alternative basis for holding the Guideline presumptively constitutional, and is worth examining.

*Bruen's* third question was whether "the plain text of the Second Amendment protects" the parties' "proposed course of conduct." *Id.*  In *Bruen*, the proposed conduct was "carrying handguns publicly for self-defense," which was conduct protected by the Second Amendment. *Id.* In this case, the conduct is possessing a dangerous weapon during the course of illegal trafficking activity. *See* USSG 2D1.1(b)(1), cmt. n.11. That conduct is unprotected by the Second Amendment.

17

Although Section 2D1.1(b)(1) does not require as close a connection between a defendant, a weapon, and a crime, as other provisions, it does still require some connection. *See United States v. Baldon*, 956 F.3d 1115, 1127-28 (9th Cir. 2020) (discussing and applying Ninth Circuit requirements, which exceed mere proximity among drugs, a defendant, and a weapon, and require dominion and control); *United States v. Nelson*, 222 F.3d 545, 550 (9th Cir. 2000) (noting the difference in burdens of proof in USSG Section 5C1.2, which defines safety valve eligibility, and USSG Section 2D1.1(b)(1)). If there were no connection between the danger of unlawful violence that drug traffickers pose when they do and they do not have a readily accessible weapon, the rationale for the Guideline would not exist. Moreover, the Guideline specifically excepts defendants who can show that there truly was no connection—i.e., if "it is clearly improbable that the weapon was connected with the offense." *See* USSG § 2D1.1(b)(1), cmt. n.11.

There is no reason to believe that the Second Amendment protects criminals from punishment for increasing the risk of unlawful violence by possessing a weapon during their criminal activity. As the district court put it, Second Amendment protections do not include any

18

guarantee that "admittedly-guilty-drug-offense conspirators' sentences are not enhanced when they have possessed firearms during activities related to their offense." *See* (ER-3; 45-46 (citing *Moreno*, 811 F. App'x at 223-24)). Gun possession during illegal activity is simply not the kind of lawful use of weapons by citizens that the Second Amendment was designed to protect. *See Bruen*, 142 S. Ct. at 2122. "To hold the contrary would suggest that the Second Amendment protects an individual's right to possess a weapon for criminal purposes." *Greeno*, 679 F.3d at 520. Section 2D1.1(b)(1) therefore falls outside the scope of the Second Amendment based on *Bruen's* third question, as well as its first. Thus, this Court has two alternative bases on which to hold the Guideline presumptively constitutional.

The two Circuits with published opinions addressing 2D1.1(b)(1)'s constitutionality under the first prong specifically cited the dangerous and unprotected nature of the conduct that the Guideline regulates. *See Napolitan*, 762 F.3d at 311; *Greeno*, 679 F.3d at 518. In *Greeno*, for example, the Sixth Circuit explained that "[t]he Section 2D1.1(b)(1) enhancement, like other historical restrictions on the possession and use of weapons, punishes an individual who possesses a dangerous

19

weapon *for an unlawful purpose* and, thus, it falls outside the scope of the Second Amendment right." *Greeno,* 679 F.3d at 520 (citing USSG § 2D1.1(b)(1) cmt. n.3(A) (2011) (emphasis added). And in *Napolitan*, the Third Circuit held that the Second Amendment simply has no "bearing on the application of U.S.S.G. § 2D1.1(b)(1)'s firearm enhancement," just as "it does not entitle a drug trafficker to carry a firearm in furtherance of his criminal exploits." *Napolitan*, 762 F.3d at 311. While the connection between the firearm and the crime is obviously less than in other statutes, *Napolitan* recognized that a relationship still exists. *Id.* at 309 (quoting *United States v. Ruiz*, 621 F.3d 390, 396 (5th Cir. 2010).) And indeed, a weapon increases the likelihood of unlawful violence in protection of unlawful activity. Likewise, unpublished dispositions have concluded that Second Amendment protection does not extend to protecting the dangerous and risky conduct penalized by the Guideline. *See, e.g.*, *Moreno*, 811 F. App'x at 223-24; *United States v. Goodlow*, 389 F. App'x 961, 969 (11th Cir. 2010) (per curiam); *United States v. Riley*, 359 F. App'x 402, 404 (4th Cir. 2010) (per curiam); *United States v. Jacobson*, 406 F. App'x 91, 93 (8th Cir. 2011) (per curiam).

Because the Second Amendment protects only the lawful use of guns, the Guideline does not impinge upon it. Accordingly, *Bruen*'s third question provides an alternative basis for holding the Guideline presumptively constitutional under the first prong. Again, this Court need proceed no further. In the interest of thoroughness, however, this brief examines the remaining question posed by *Bruen*.

**C.      While not definitive, the nature of several of the firearms in this case also tends to support the constitutionality of Section 2D1.1(b)(1) as applied to this Defendant. Thus, *Bruen*'s remaining question offers some support as well.**

The remaining question that *Bruen* asked in the first prong was whether the guns being regulated were "weapons 'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2134. In *Bruen*, which dealt with handguns, the answer was "yes" because no one disputed that handguns were in common use for self-defense. *Id.* In this case, this question is not determinative when it comes to a facial challenge. After all, Section 2D1.1(b)(1) regulates all firearms, not merely those commonly used for lawful purposes. Moreover, as this Circuit has already held, the lawful use of a weapon on some occasions does not preclude its unlawful use on other occasions. *See United States v. Potter*, 630 F.3d 1260, 1261 (9th

Cir. 2011) (per curiam) (noting that it was entirely possible, but irrelevant, that the defendant "kept the firearm *also* to protect himself and his home," not merely to further his crime); *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009) (rejecting argument that the Second Amendment permitted the defendant to be armed because "he lived in a dangerous neighborhood and wanted to protect himself from burglars and marauders"). *Bruen's* question regarding the nature of the firearms, however, does support the constitutionality of Section 2D1.1 *as applied* to this Defendant.[4]

"A sentencing court properly may take into consideration the type of weapon found in the defendant's residence in determining whether the weapon was connected to the drug offense." *United States v. Lopez-Sandoval*, 146 F.3d 712, 716 (9th Cir. 1998); *see also United States v. Stewart,* 926 F.2d 899, 902 (9th Cir. 1991) (a machine gun cannot be viewed as a sporting piece). Some of the guns the Defendant possessed,

---

[4] The Defendant seems to be raising a purely facial challenge, though he does discuss the facts a good deal. At least the Third Circuit has suggested that even a presumptively-constitutional regulation may be challenged as applied, however. *See United States v. Barton*, 633 F.3d 168, 172-73 (3d Cir. 2011), *overruled on other grounds by Binderup v. Attorney General of United States*, 836 F.3d 336, 349 (3d Cir. 2016).

22

like the rifle found behind his couch, (SD-201), are commonly used for sporting purposes (though the behind-the-couch-storage is not so typical). But the Defendant also possessed an AK-47 and AR-15s. *See* (1-SER-3-7; 2-SER-13.) Such weapons are not commonly used for sporting purposes. *See* (ER-41-43.) Moreover, they are associated with drug trafficking and with drug lords that the evidence showed Defendant sought to emulate. *See* (ER-49, 60-61, 73; 2-SER-13.)

The district court generously concluded that the evidence in this case did not rise to the level of showing that the guns were "connected" to the Defendant's drug trafficking such that the safety valve was unavailable, but it did hold that they were sufficiently related to apply Section 2D1.1(b)(1). The nature of at least four of the guns found lends support to this conclusion. *See* (ER-23, 41; SD-201-02.) Thus, *Bruen's* remaining question suggests that Section 2D1.1(b)(1), as applied to the Defendant, and specifically in relationship to the AK-47 and AR-15s, did not impinge upon the Second Amendment.

In light of the two alternative bases for concluding that Section 2D1.1(b)(1) is presumptively constitutional under the first prong

inquiry, this Court need not proceed to the second prong at all. *See Bruen*, 142 S. Ct. at 2135 (noting that, after failing the first prong, respondents bore the burden "to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation"). Again, however, in the interest of thoroughness, this brief will proceed to analyze that prong as well.

## II. Section 2D1.1(b)(1)'s incremental penalty for the increased risk posed by possessing a dangerous weapon during criminal conduct is well in line with historical tradition.

Even assuming that Section 2D1.1(b)(1) somehow does burden Second Amendment rights, to the extent it does so, it is consistent with historical tradition. Thus, this Court should affirm the Guideline's constitutionality under *Bruen's* second step.[5]

---

[5]    The Government rejects the Defendant's contention that it waived argument under the second prong. *See* (AOB at 21 (arguing that the analogical inquiry is actually "evidentiary," citing out-of-circuit district court precedent suggesting that expert testimony is required and suggesting that the Government forfeited its opportunity to present historical analogues). Although the Government focused primarily on the first prong, *see, e.g.*, (ER-39-40, 71, 78), the district court considered and discussed the second prong. It also discussed caselaw that applied the second prong and discussed meaningful historical analogues. *See* (ER 3-5.) Thus, this Court may consider the second prong on appeal.

In addition, the defense contention that the historical inquiry is really "evidentiary" and requires the testimony, for example, of a

The second step involves identifying well-established, representative, historical regulations and comparing them to the modern regulation in question. *See Bruen*, 142 S. Ct. at 2133. If a meaningful, representative historical analogue exists, then the burden placed on Second Amendment rights by the modern regulation will be compatible with historical burdens on that Amendment. *Id.* This can be true even if the modern regulation would have been "unimaginable at the founding." *Id.* at 2132.

Thus, for example, *Bruen* explained that "longstanding laws forbidding the carry of firearms in sensitive places such as schools and

---

historian, is far from established. *See* (AOB at 21.) Indeed, the dissent in *Bruen* criticized the majority opinion based on its lack of clarity regarding what the inquiry entails and discussed the problems of district courts' lesser resources. *See Bruen*, 142 S. Ct. at 2179 (Kagan, J., dissenting). The majority opinion relied on historical analysis already performed by courts and emphasized the Court's own approach in *Heller*. "We then canvassed the historical record," the Court explained, and proceeded to describe the kinds of sources the Court found particularly persuasive. *Id.* at 2127-28. Likewise, historical court decisions evidence historical practice, and can presumably be cited as "evidence" without expert testimony or a hearing. Certainly, other Circuits have done so. *See, e.g.*, *Greeno*, 679 F.3d 519-20. Accordingly, the Government will proceed with its examination of the second prong, as it provides an alternative ground for affirmance. *See* (ER-3.)

government buildings" would establish the permissibility of limitations in more modern, but similarly sensitive, places. *Id.* (quoting *Heller*, 554 U.S. at 627) (internal quotation marks omitted). If the new regulations placed comparable burdens on Second Amendment rights for comparable reasons, they would be held to burden rights in a manner that fell within the nation's historical tradition. *Id.*

At the time of the Second Amendment, illegal drug trafficking, at least as we know it today, did not exist. Drugs were not even illegal. *See Greeno*, 679 F.3d at 519 (noting that laws making drugs illegal at all, "are of relatively recent vintage"); Margarita Mercado Echegaray, *Drug Prohibition in Am.: Fed'l Drug Policy and its Consequences*, 75 Rev. Jur. U.P.R. 1215, 1219 (2006). The first comprehensive regulation targeting drug trafficking was enacted in 1970. *See Gonzales v. Raich*, 545 U.S. 1, 10-11 (2005). Section 2D1.1(b)(1), the provision at issue in this case, was enacted in 1987, in the first version of the Sentencing Guidelines. *See* USSG § 2D1.1(b)(1) (1987).

As *Bruen* explained, no historical "twin" need be found, however, just a meaningful, representative analogue. *Bruen*, 142 S. Ct. at 2133.

And, as it turns out, the practice of increasing sentences when criminals have firearms has a long history in this country.

In the late Eighteenth and Nineteenth centuries, many states imposed more severe punishment on individuals who had a weapon during their crimes. *See id.*; *Greeno*, 679 F.3d at 519-20 (collecting Nineteenth Century cases). Thus, an 1805 statute in Massachusetts, which had existed and evolved over decades, added additional punishment if any of any number of aggravating circumstances existed, including the presence of a weapon. *See Commonwealth v. Hope*, 39 Mass. 1, 9-10, 22 Pick. 1 (Mass. 1839) (describing the early evolution of the crime of burglary, culminating in an 1805 law that "divides this offence of burglary and housebreaking into various classes. Burglary in the night time, if the person was armed with a dangerous weapon, was punished by death; if not armed, by hard labor for life; but if the offence was committed in the daytime, the penalty was less severe.") Accordingly, the Massachusetts legislature sought to increase punishment when various aggravators existed — like the time of day or night or the presence of a weapon.

27

A pre-1876 statute in Missouri provided additional punishment for burglary if it was committed with a dangerous weapon or if other aggravators were present. *See State v. Tutt*, 63 Mo. 595, 599 (Mo. 1876). One case applying that statute noted that the long list of "concurrent acts," or aggravators, that were present in that case—one of which was a weapon—"clearly fixed the grade of the crime, and applied it to the allegations contained in the indictment" such that burglary in the first degree, and not in the second, was the appropriate crime. *State v. Alexander*, 56 Mo. 131, 132 (1874), *overruled by State v. Young*, 345 Mo. 407 (1939). In other words, the greater danger posed by the presence of a firearm demanded a higher degree of burglary, and correspondingly greater punishment.[6]

---

[6]    The historical record also suggests that affirmative disarming of individuals who were unlawfully using firearms was acceptable. Thus, in the founding era, "justices of the peace, sheriffs, and constables" were allowed to disarm people who were "armed in terror of the peace." *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 501 (2004); *see also State v. Huntly,* 25 N.C. 418, 3 Ired. 418, 418 (1843) (discussing the common law history of the offense of riding or going armed with dangerous or unusual weapons, to the terror of the people).

Likewise, Kansas, New York, New Jersey, and Minnesota increased the degree (and the punishment) of crimes like robbery, assault, and burglary if a weapon was used. *See, e.g.*, *State v. O'Neil,* 71 Minn. 399 (Minn. 1898); *People v. Rockhill*, 26 N.Y.S. 222, 223–24 (N.Y. 1893); *State v. Cash*, 16 P. 144, 145 (Kan. 1887); *Tutt*, 63 Mo. at 599; *United States v. Bernard*, 24 F. Cas. 1131, 1131 (C.C.D.N.J. 1819). These state statutes, and the cases that discuss them, operated on the familiar principle that criminals should receive greater punishment if they impose greater danger on society. They also recognized that the presence of a firearm increases danger.

The Sentencing Guidelines themselves were enacted, in part, to ensure these same principles. The Guidelines were designed to create "reasonable uniformity" and "proportionality" in sentencing, a system in which like behavior receives like punishment, and worse behavior receives greater punishment. *See* USSG Ch. 1, Pt. A.1.3 p.s. Section 2D1.1(b)(1) helps effect this goal. It increases the punishment, incrementally, if a defendant had dominion and control over a dangerous weapon during the time of his crime. The purpose of the Guideline thus closely resembles the purpose of the early state statutes.

29

Accordingly, *Bruen's* second prong also establishes the constitutionality of Section 2D1.1(b)(1). Any burden the Guideline places on Second Amendment rights meaningfully resembles the burden imposed by many states in our nation's early history. *See Bruen*, 142 S. Ct. at 2133. Moreover, Section 2D1.1(b)(1) imposes its burdens for a comparable reason: firearms enhance danger and risk when possessed by criminals during crimes. *Id.* Thus, this Court may affirm based on the second prong as well.

## CONCLUSION

This Court should affirm the constitutionality of USSG Section 2D1.1(b)(1).

Respectfully submitted this 21st day of December, 2022.

> JOSHUA D. HURWIT
> United States Attorney
> District of Idaho
> By
>
>
> s/ Christopher A. Booker
> CHRISTOPHER A. BOOKER
> Assistant United States Attorney
>
>
> s/ Syrena C. Hargrove
> SYRENA C. HARGROVE
> Assistant United States Attorney

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 22-30141

The undersigned attorney or self-represented party states the following:

[]   I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[**X**]   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*U.S. vs. Brandon J. Yates*, U.S.C.A No. 22-3005, raises closely related issues.

**Signature** s/ Christopher A. Booker   Date  **December 21, 2022**

*(use "*s/[typed name]*" to sign electronically-filed documents*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs
*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-30141

I am the attorney or self-represented party.

**This brief contains 5738 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　　[ ] it is a joint brief submitted by separately represented parties;
　　[ ] a party or parties are filing a single brief in response to multiple briefs; or
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Christopher A. Booker　　　　　　**Date** December 21, 2022
*(use "*s/[typed name]*" to sign electronically-filed document*

32