**U.S.C.A No. 22-30141**
**U.S.D.C. No. 1:21-cr-00243-BLW**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff/Appellee,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **MIGUEL MICHAEL ALANIZ,** | ) |
| | ) |
| **Defendant/Appellant.** | ) |
| | ) |
| _____ | ) |

Appeal from the United States District Court
For the District of Idaho
The Honorable B. Lynn Winmill, District Court Judge

**MR. ALANIZ'S REPLY BRIEF**

Miles Pope
Federal Defender Services of Idaho
702 West Idaho Street, Suite 1000
Boise, Idaho 83702
Telephone: (208) 331-5500
Attorneys for Defendant-Appellant
MIGUEL MICHAEL ALANIZ

# TABLE OF CONTENTS

Argument ............................................................................................. 1

A. The deep problem with the government's answer .......................... 2

B. The plain text of the Second Amendment covers Mr. Alaniz's possession of a firearm. ......................................................................... 5

    1. Mr. Alaniz is part of "the people," and the government's contrary argument is irreconcilable with the Second Amendment's text, irreconcilable with Supreme Court precedent, conceptually confused, and practically unworkable. .............................................................. 6

    2. Mr. Alaniz's firearms possession is protected Second Amendment conduct. ............................................................................................ 12

C. The government fails to carry its burden to establish the constitutionality of applying § 2D1.1(b)(1) to Mr. Alaniz. ................... 17

    1. The Court should not entertain the government's belated argument that punishing Mr. Alaniz for possessing firearms is in keeping with the Nation's historic traditions. .................................. 17

    2. The government's argument fails on the merits. ....................... 20

        a. The government applies the wrong test .................................. 20

        b. The government fails to carry its historical burden. ................ 22

Conclusion ......................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Commonwealth v. Hope*, 39 Mass 1 (Mass. 1839)..............................25, 27

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................6, 8, 10, 13

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022) ................................................................. passim

*People v. Rockhill*, 26 N.Y.S. 222 (N.Y. 1893)..................................24, 26

*Sineneng-Smith*, 140 S. Ct. at 1579)........................................................18

*State v. Alexander*, 56 Mo. 131 (1874)..............................................24, 26

*State v. Cash*, 16 P. 144, 145 (Kan. 1887)........................................24, 26

*State v. O'Neil*, 71 Minn. 399 (Minn. 1898) ....................................24, 26

*State v. Tutt*, 63 Mo. 595 (Mo. 1876)................................................24, 26

*State v. Young*, 345 Mo. 407 (1939)..........................................................24

*Stimmel v. Sessions*, 879 F.3d 198 (6th Cir. 2018) .............................8, 26

*United States v. Bernard*, 24 F. Cas. 1131 (C.C.D.N.J. 1819)...............25

*United States v. Brockius*, 24 F. Cas. 1242 (Pa. C.C. 1811) ...................26

*United States v. Carrero*, 2022 WL 9348792 (D. Utah Oct. 14, 2022)......7

*United States v. Coombes*, 2022 WL 4367056
(N.D. Okla. Sept. 21, 2022) ..................................................................7

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ........................11

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ..........................16

*United States v. Jacobson*, 406 F. App'x 91 (8th Cir. 2011) ..................16

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022)............7

*United States v. Moreno*, 811 F. App'x 219 (5th Cir. 2020) ...................16

*United States v. Napolitan*, 762 F.3d 297 (3d Cir. 2014) .......................15

*United States v. Nelson*, 222 F.3d 545 (9th Cir. 2000) .............................2

*United States v. Perez-Gallan*, 2022 WL 16858616
(W.D. Tex. Nov. 10, 2022)..............................................................9, 10

*United States v. Phillips*, 827 F.3d 1171 (9th Cir. 2016)........................11

*United States v. Quiroz*, 2022 WL 4352482
(W.D. Tex. Sept. 19, 2022)..................................................................14

*United States v. Riley*, 359 F. App'x 402 (4th Cir. 2010)........................16

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) ......................18

## Statutes

18 U.S.C. § 922(g)(8) .................................................................................. 11

## United States Sentencing Guidelines

USSG § 2D1.1(b)(1) ......................................................... passim

## Other Authorities

Aaron T. Knapp, *From Empire to Law: Customs Collection in the American Founding*, 43 Law & Soc. Inquiry 554 (2018) .................... 26

## Argument

The Court should reverse and remand for resentencing because the district court unconstitutionally enhanced Mr. Alaniz's sentence in violation of the Second Amendment.

In its answer, the government says that the plain text of the Second Amendment does not cover the conduct for which Mr. Alaniz's punishment was enhanced – possessing firearms in his home and truck (AB at 10-24). For reasons explained in part B, that textual claim is false.

The government next says that – even if the Second Amendment's plain text did cover Mr. Alaniz's firearm possession – it can still carry its *Bruen* step-two burden to affirmatively establish the constitutionality of enhancing Mr. Alaniz's sentence based on the presence of firearms in this case (AB at 24-30). For reasons explained in part C, the government is too late in making this claim, and, even if the Court were to address it, it fails on the merits.

First, however, part A clarifies the issue this appeal presents and explains why large chunks of the government's answer are simply irrelevant to that issue.

## A.    The deep problem with the government's answer

Even though Mr. Alaniz presented and argued the issue as an as-applied challenge to the constitutionality of § 2D1.1(b)(1), the government mostly acts as if this case raises a blunt, facial constitutional challenge to § 2D1.1(b)(1) (*compare* OB at 1, 27-28, *with* AB at 24-30; *but see* AB at 21-24). This is wrong. The issue in this case is whether a nonviolent non-felon's punishment may be enhanced merely because firearms were present while he distributed drugs – and in the face of a judicial finding that the guns probably played no role in his offense.

That issue is fixed by the record in this case. The court below ruled that – notwithstanding the presence of firearms in his home during drug trafficking activity – Mr. Alaniz was safety-valve eligible (ER 44). To reach this result, the court found – *had* to find – by preponderance of the evidence that Mr. Alaniz did not possess firearms in connection with drug trafficking. *United States v. Nelson*, 222 F.3d 545, 550 (9th Cir. 2000). Despite making this finding, the court applied § 2D1.1(b)(1) to increase the severity of Mr. Alaniz's guideline range – and the severity of his sentence – because, in the court's view, it was not clearly improbable that firearms played a role in Mr. Alaniz's drug trafficking offense.

It is the constitutionality of applying § 2D1.1(b)(1) to a safety-valve eligible, nonviolent, non-felon that Mr. Alaniz challenges, not the constitutionality of § 2D1.1(b)(1) writ large. That narrow issue requires an equally narrow and nuanced analysis, which the government's answer almost wholly fails to undertake. For example, in evaluating whether the plain text of the Second Amendment covers Mr. Alaniz's conduct, the government frames the issue as whether § 2D1.1(b)(1) – writ large – burdens the Second Amendment right (AB at 10). The government does the same thing in arguing that punishing Mr. Alaniz is in keeping with the Nation's traditions of firearm regulation, simply pointing to the existence of some (problematic, as explained below) examples of criminalization of firearm use without connecting those examples to the fact pattern at issue here (*see* AB at 24-30). This is inapposite to the issue on appeal.

Worse, the government asks the Court to rest its analysis on proffered facts that are either nowhere in the record or affirmatively inconsistent with the district court's findings, as when it argues that "the nature of several of the firearms in this case . . . tends to support the constitutionality of Section 2D1.1(b)(1) as applied to [Mr. Alaniz]"

because they are "associated with drug trafficking and . . . drug lords" (AB at 23). This argument is simply unavailable to the government. By finding that Mr. Alaniz was safety-valve eligible, the district court also found that the firearms *probably were not* connected to the drug-trafficking activity in this case (*see* AB at 5 (conceding this point)). The government's (inaccurate and record-unsupported) suggestion that Mr. Alaniz's firearms *probably were* connected to drug trafficking because he possessed common, legal, readily available, and easily procurable rifles simply flies in the face of a district court finding that the government could have, but elected not to, challenge on appeal.

In evaluating the constitutionality of applying § 2D1.1(b)(1) to Mr. Alaniz, therefore, the Court must assess whether the Second Amendment protects firearm possession by nonviolent non-felons in circumstances where possession of those weapons was probably unconnected with drug-trafficking activity – and, at *Bruen* step two, it is the government's burden to establish that enhancing punishment for the presence of a firearm under *those circumstances* is consistent with the Nation's historical traditions of firearm regulation. For reasons explained in Mr.

Alaniz's opening brief, and the remainder of this reply, the government has failed to carry that burden in this case.

**B.    The plain text of the Second Amendment covers Mr. Alaniz's possession of a firearm.**

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. 2111, 2126 (2022). The plain text of the Second Amendment's operative clause contains three textual elements: it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." U.S. Const., Amdt. 2. Here, Mr. Alaniz satisfies all three elements: his punishment was enhanced in this case because he was a member of "the people" who possessed (kept) firearms ("Arms") in his home and truck at around the same time as – but in a way unconnected with – participating in drug-trafficking activity.

The government makes two main arguments to the contrary: 1) it argues that individuals stop being "part of 'the people'" when they are engaged in criminal conduct such as "[f]elony drug traffick[ing]" (AB at 11-16); and 2) it argues – without meaningful textual analysis – that anybody engaged in "criminal conduct" loses their right to possess a weapon (AB 17-21). Both arguments fail.

1. **Mr. Alaniz is part of "the people," and the government's contrary argument is irreconcilable with the Second Amendment's text, irreconcilable with Supreme Court precedent, conceptually confused, and practically unworkable.**

To begin, nothing in the Second Amendment's text supports the government's gloss on "the people" to mean "ordinary, law-abiding citizens" (AB at 11). Just as the amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a felon/non-felon or law-abiding/non-law-abiding distinction either. "Nothing in the Second Amendment's text" suggests those who have been convicted of a felony are unentitled to the amendment's protection. *Id.*

As Mr. Alaniz pointed out in his opening brief, Supreme Court precedent confirms this. Construing the words "the people," the *Heller* Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580. *Heller* explained that because "the people" refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community," the Second Amendment's right extends to "*all* Americans." *Id.* at 581

(emphasis added). As numerous courts have recognized, the government's contrary argument contravenes *Heller*'s analysis – analysis that was central to *Heller*'s ruling that the Second Amendment protects an individual right to keep and bear arms. *See, e.g.*, *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (pre-*Bruen* case recognizing that even "dangerous felons" are "indisputably part of 'the people'"); *United States v. Carrero*, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (holding, post-*Bruen*, that non-law-abiding individuals are among "the people" safeguarded by the Second Amendment); *United States v. Coombes*, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) (same).

The government's argument that "the people" encompass only "ordinary, law-abiding citizens" ultimately derives from a comment *Heller* made when determining the proper standard of review for Second Amendment claims. In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by thepeople." *Id.* at 634-35 (emphasis in original). Judges therefore lack authority to "conduct [that balancing] anew" or "decide on a case-by-case

basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of heart and home." *Id.* at 635. This latter sentence, the argument goes, limits the right to keep and bear arms to "law-abiding" citizens.

This argument rests on a misreading of *Heller*. By beginning the quoted passage with "whatever else it leaves to future evaluation," the *Heller* Court made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling. The Court held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether – much less rule out the conclusion that – other people have that right, too. Rather, it expressly left that question "to future evaluation." *Id. Heller*'s reference to "law-abiding citizens" plainly does not purport to amend, sub silentio, its holding that "the people" are all members of the national community, and "not an unspecified subset." *Id.* at 580; *see Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018) (*Heller* "conclusively established [that] the

Second Amendment applies to law-abiding and peaceable citizens *at the very least*"); *Perez-Gallan*, 2022 WL 16858516, at *8 (explaining *Heller* "defined 'the people' as 'members of the political community,' not 'law-abiding, responsible citizens'").

In its answer, the government emphasizes *Bruen*'s reference to "ordinary, law-abiding citizens" in arguing that the Second Amendment rights are limited to "law-abiding citizens" (AB at 11). Ironically, this emphasis serves to underscores the hopelessness of the government's position. The government is, indeed, correct that *Bruen* held "that *ordinary*, law-abiding citizens have [the]right to carry handguns publicly for their self-defense." *Bruen*, 142 S. Ct. at 2122 (emphasis added). But if – as the government's theory requires – the word "law-abiding in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the government does not believe that unordinary citizens lack Second Amendment rights. The Supreme Court would never purport to limit fundamental, enumerated constitutional rights to "ordinary" people. Such a restriction would be the quintessence of defining "the people" to encompass only an "unspecified subset" of the

national community – precisely what the Supreme Court has forbidden. *Heller*, 554 U.S. at 580.

The government's construction of "the people" also injects conceptual confusion into the law. As Mr. Alaniz's opening brief observed, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning across the First, Second, Fourth, and Ninth Amendments. *Id.* at 580. If the government's interpretation is correct, then, it would follow that Mr. Alaniz lacked not just Second Amendment rights, but also the First Amendment right to speak about matters of public concern and worship according to his faith and the Fourth Amendment right to be free from warrantless searches of his home. *Cf. United States v. Perez-Gallan*, 2022 WL 16858616, at *9 (W.D. Tex. Nov. 10, 2022) (striking down 18 U.S.C. § 922(g)(8), which bars firearm possession by people subject to intimate-partner restraining orders, and explaining that because such people "may invoke the protections of [the First and Fourth Amendments]," they may also invoke the protections of the Second). This is not an analytical road the Court should go down.

Last, the government's proposed "law-abiding" standard is vague and unworkable. It is unclear whether the phrase refers to past or

present wrongdoing. It is equally unclear what type of wrongdoing it covers – a crucially important issue given the government thinks that a person can cease to be "law-abiding," and thus lose Second Amendment protections, even if they are not first adjudicated as such (*see* AB at 14). Is "Congress's and the States' power in this regard . . . unfettered, or [is it instead] that only crimes that were treated as felonies at the Founding can serve as the basis for depriving someone of his or her Second Amendment rights?" *United States v. Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016). And what's the limit? Felony drug trafficking? Felonious behavior in general? Only certain misdemeanors? *Cf.* 18 U.S.C. § 922(g)(8). "Why not all misdemeanors? Why not minor infractions? Could Congress find someone once cited for disorderly conduct to be 'not law-abiding' . . .?" *Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring). What about civil infractions?

The government does not say, presumably wanting to leave the assessment of who exactly is and is not "law-abiding" to case-by-case development. But this gets *Bruen* backwards. *Bruen* rejects interest-balancing analyses of who is and is not "law-abiding" in favor of "unqualified deference" to the Second Amendment, whose text

encompasses *the people*. 142 S. Ct. at 2131. It is to the people, full stop, that the Second Amendment guarantees the right to keep and bear arms.[1]

### 2. Mr. Alaniz's firearms possession is protected Second Amendment conduct.

The government next argues that the plain text of the Second Amendment does not protect Mr. Alaniz's firearm possession because that possession occurred "during the course of illegal drug trafficking activity" (AB at 17).

This is simply wrong as a textual matter. The plain text of the Second Amendment protects the right of the people to "keep and bear" arms, and that is what Mr. Alaniz did in this case: his gun-related conduct consisted of possessing firearms in his home and his truck (*see* ER 23, 44). This mere firearm possession – the conduct for which Mr.

---

[1] The government seeks to defend USSG § 2D1.1(b)(1) by emphasizing what it views as its narrowness, arguing that it "penalizes possession of firearms during a precise time frame," that it "penalizes a small class of serious criminals . . . who present special danger when they have firearms readily available," and that "it even excepts defendants who . . . can establish that it is clearly improbable that the weapon was connected to their criminal conduct" (AB at 15-16). This argument has absolutely nothing to do with the Second Amendment's text and simply represents an effort to resurrect the balancing-test analysis that *Bruen* rejected. *See* 142 S. Ct. at 2139-30.

Alaniz's sentence was enhanced – is plainly covered by the plain text of the Second Amendment. "[T]he most natural reading of 'keep arms' in the Second Amendment is to 'have weapons.'" *Heller*, 554 U.S. at 582. Just like "[n]othing in the Second Amendment's text draws a home/public distinction," so too nothing in the Second Amendment draws distinction between keeping an arm for self-defense and keeping an arm for criminal purposes. *Bruen*, 142 S. Ct. at 2134.

Nor would such a distinction, if it did exist, help the government here. That's because there is no allegation, much less finding, that Mr. Alaniz brandished, discharged, displayed, or even used firearms in connection with criminal activity. What's more, the district court expressly found that the firearms he possessed probably had no connection to his drug-trafficking offense (ER 44). Section 2D1.1(b)(1) was thus applied to enhance Mr. Alaniz's punishment solely for the possession of firearms – conduct that the plain text of the Second Amendment plainly covers. *See Bruen*, 142 S. Ct. at 2135, 2136 (having "little difficulty" in concluding that the "textual elements" of the Second Amendment "guarantee[] a *general right* to public carry" as well as to

"keep firearms in the[] home" (emphasis added)). Looking just to the text – as step one requires – shows the activity is protected.

Ultimately, the government's conduct-based step one argument represents less a textual argument *under Bruen* and more a sotto voce effort to *repudiate Bruen*. The issue of whether firearm possession during criminal activity may be validly punished plainly arises under *Bruen* step two; it is plainly a question of whether (and how) the Nation's historical traditions permit regulating possession of firearms involved in criminal conduct. In arguing otherwise – in arguing that the plain text of the Second Amendment does not cover "[p]ossessing a weapon during criminal conduct, thereby imposing greater danger on society" (AB at 17) – the government is simply attempting to lessen its burden under *Bruen* by smuggling step-two questions into *Bruen*'s step one. *Cf. United States v. Quiroz*, 2022 WL 4352482, at *3 (W.D. Tex. Sept. 19, 2022) ("The Government first frames Defendant's conduct as 'buying a gun *while under felony indictment.*' *Bruen*'s first step, however, requires only that 'the Second Amendment's plain text covers the *conduct.*' And the prohibited conduct under § 922(n) is 'receipt' of a firearm – nothing more. By adding 'while under indictment' to the conduct, the Government

conflates *Bruen*'s first step with its second."). Worse, in arguing for the constitutionality of § 2D1.1(b)(1) by repeatedly emphasizing the purported risks created by firearm possession during criminal conduct, the government attempts to reintroduce, into *Bruen* step one, the means-end balancing test that *Bruen* rejects (*see* AB at 20 (possessing firearms is "dangerous and risky conduct"), AB at 18 ("increas[ed] the risk of unlawful violence")). The Court should not endorse this maneuver.

Last, it's important to note that the pre-*Bruen* cases the government cites for the proposition that § 2D1.1(b)(1) punishes conduct falling "outside the Second Amendment's scope" – i.e., for the proposition that § 2D1.1(b)(1) is constitutional under *Bruen*'s step one – are inapposite (AB at 19-20). Unsurprisingly, given the government's strategy of trying to subvert *Bruen* step one, the cases it cites simply do not use *Bruen*'s step-one interpretive method of asking whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129-30. *See United States v. Napolitan*, 762 F.3d 297, 311 (3d Cir. 2014) (concluding without significant analysis that § 2D1.1(b)(1) is constitutional because "a drug trafficker [is not entitled] to carry a firearm in furtherance of his criminal exploits"); *United States v. Greeno*,

679 F.3d 510, 518-20 (6th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. 2111 (upholding § 2D1.1(b)(1) – not because the plain text of the Second Amendment doesn't cover the conduct it punishes – but based on the court's view that a wide variety of predominantly late-nineteenth-century cases permitted enhanced punishment when a firearm was used in connection with certain types of offense); *United States v. Moreno*, 811 F. App'x 219, 224 (5th Cir. 2020) (using *Bruen*-repudiated balancing test to uphold § 2D1.1(b)(1) on basis that "drug traffickers pose a risk to society that is enhanced by their possessing firearms"); *United States v. Goodlaw*, 389 F. App'x 961, 969 (11th Cir. 2010) (per curiam) (no textual analysis of Second Amendment in reaching result that § 2D1.1(b)(1) is constitutional); *United States v. Riley*, 359 F. App'x 402, 404 (4th Cir. 2010) (per curiam) (same); *United States v. Jacobson*, 406 F. App'x 91, 93 (8th Cir. 2011) (per curiam) (same under plain error review).

~     ~     ~

Mr. Alaniz is one of "the people" the Second Amendment protects and his firearm possession is protected Second Amendment conduct; it follows that punishing him for it, as § 2D1.1(b)(1) does, is presumptively unconstitutional.

**C.     The government fails to carry its burden to establish the constitutionality of applying § 2D1.1(b)(1) to Mr. Alaniz.**

In its answer, for the very first time in this case, the government finally attempts to carry its burden to show that enhancing Mr. Alaniz's punishment for possessing firearms is consistent with the Nation's historical traditions.

This is too late, so the Court should not even entertain the government's belated *Bruen* step-two arguments. If the Court does entertain them, they fail on the merits.

**1.     The Court should not entertain the government's belated argument that punishing Mr. Alaniz for possessing firearms is in keeping with the Nation's historic traditions.**

Even though it didn't even attempt to carry its step-two burden below, the government says it can make its step-two arguments now because it was rescued by the district court (*see* AB at 24 n.5 ("[T]he district court considered and discussed the second prong. . . . Thus, this Court may consider the second prong on appeal.")).

Wrong. Under the party presentation principle, it's not the proper role of district courts to "sally forth" – as the government essentially concedes the district court did here – to rescue one party from its deficient

presentation. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). Instead, the parties "are responsible for advancing facts and arguments entitling them to relief" – not just on appeal, but also "in the first instance." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (citation omitted).

This principle applies with particular force in the context of *Bruen* claims. *Bruen* expressly emphasized the importance of party presentation at step two. Responding to the dissent's claim that "text-and-history test will prove unworkable compared to means-end scrutiny in part because judges are relatively ill equipped to resolve difficult historical questions or engage in searching historical surveys," *Bruen*, 142 S. Ct. at 2130 n.6. (citations omitted), the *Bruen* Court explained that no workability problems would arise because courts "decide a case based on the historical record compiled by the parties" and because "in our adversarial system of adjudication, *we follow the principle of party presentation*," *id.* (citing *Sineneng-Smith*, 140 S. Ct. at 1579) (emphasis added).

Further bolstering the importance of the principle of party presentation in this context is a fact *Bruen* again emphasized: that

whether a burden on firearm rights is in keeping with the Nation's historic traditions is ultimately an *evidentiary* question, making it particularly inappropriate to be raised for the first time on appeal. *See id.* (describing the step-two inquiry as an "historical inquiry" that "relies on various *evidentiary principles* and default rules" (internal quotation marks omitted) (emphasis added)); *see also* OB at 21 (noting that party-presentation deficiencies at the district court level are fatal in what *Bruen* itself says is the analogous context of the First Amendment).

*Bruen*'s own analysis illustrates the nuanced factual issues that evaluating the Nation's historic traditions of firearm regulation implicates. For example, in assessing whether "surety laws" – laws requiring individuals to post bond before carrying a firearm – supported New York's proper-cause requirement, *Bruen* relied on scholarship that "canvassed 19th-century newspapers" to determine that such laws seemed to be used to "target[] [black defendants] for selective or pretextual enforcement." *Bruen*, 142 S. Ct. at 2150. And *Bruen* also emphasized that evaluating the Nation's historical traditions is in large part an exercise in social history. *See id.* at 2131 (explaining that assessing the constitutionality of modern firearm regulations requires

knowledge of whether the problem that regulation addresses is a "general societal problem that has persisted since the 18th century" and whether the problem was previously addressed "through materially different means" that the regulation at issue).

Again, the government didn't even try to carry its step-two burden before the district court. That failure, under the principle of party presentation, means this Court should not even reach its belated step-two arguments here.

### 2.    The government's argument fails on the merits.

In the event the Court does reach the government's step-two arguments, they fail on the merits.

### a.    The government applies the wrong test

At the outset, the government's arguments fail on the merits because it turns on the wrong legal test. The government attempts to defend Mr. Alaniz's firearm-enhanced punishment by seeking to identify relevantly similar, general historical analogs to § 2D1.1(b)(1) (*see* AB at 25-30 (searching for "meaningful, representative historical analogue[s]" of § 2D1.1(b)(1)). But this form of analogical argument is not available to the government because, under *Bruen*, "analogical reasoning" and the

"relevantly similar" test are reserved for regulations aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Bruen*, 142 S. Ct. at 2132; *see also* OB at 25-26 (explaining *Bruen*'s step-two framework). Being armed while illegally trafficking in goods or substances would hardly have been foreign to the founders.

When, as here, a firearm regulation addresses a longstanding problem that's not of recent technological vintage, the government needs to satisfy a heightened test to establish that the regulation is in keeping with the Nation's historic traditions. Instead of identifying "relevantly similar" historical analog to the regulation at issue, the government needs to show the existence of a "*distinctly* similar" regulation. *Bruen*, 142 S. Ct. at 2132. The government has not attempted to make this showing here, and it should therefore be deemed to have abandoned any argument that it can satisfy *Bruen*'s "distinctly similar" test.

In any event, the government cannot satisfy this test. While *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* thought "distinctly similar" to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol .

. . unless he has reasonable grounds for fearing an unlawful attack on his person. *Id.* 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 2123-24 & n.2. In a challenge to § 2D1.1(b)(1), then, a "distinctly similar" historical regulation would be one that enhanced punishment *specifically* for involvement in illegal trafficking. But no such statutes appear in the 18th- or 19th-century record.

### b. The government fails to carry its historical burden.

Instead of pointing to a "distinctly similar" historical tradition of punishing individuals in Mr. Alaniz's shoes for possessing firearms, the government instead argues that Mr. Alaniz's firearm-enhanced punishment should be affirmed because of examples from the eighteenth and nineteenth centuries where punishments were enhanced when firearms were used to perpetrate violent offenses such as burglary, robbery, assault, and "terror[izing] the peace" (AB at 27-29 & n.6). For three reasons, these examples utterly fail to carry the government's historical burden to defend the constitutionality of enhancing Mr. Alaniz's punishment.

*First*, the government has identified no example, much less historical tradition, of enhancing a person's punishment in the face of a judicial finding that they probably did not possess a firearm in connection with another crime. Yet that's exactly what happened here. Mr. Alaniz's punishment was enhanced – notwithstanding the fact that the court found he *probably* did not possess a firearm in connection with drug trafficking – because he couldn't prove it was "clearly improbable" that he possessed firearms in connection with drug distribution (ER 44). *Bruen* has already held that laws which put the burden on the people to establish the legitimacy of their firearm possession are unconstitutional. *Bruen*, 142 S. Ct. at 2156 ("We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need."). The scheme under which Mr. Alaniz was punished is thus of a piece with the scheme *Bruen* struck; it permits punishment for possessing a firearm, despite a finding by a judge that it probably had nothing to do with criminal activity, unless an individual can prove to the satisfaction of government officers that the firearm possession was clearly unconnected with drug trafficking.

The government has adduced no historical evidence that such a scheme comports with the Nation's historic traditions of firearm regulation. Indeed, every example of a firearm enhancement in its answer is an element of the offense requiring proof beyond a reasonable doubt. *See State v. Tutt*, 63 Mo. 595, 599 (Mo. 1876) (being "armed with some dangerous weapon" an element of first-degree burglary); *State v. Alexander*, 56 Mo. 131, 132 (1874), *overruled by State v. Young*, 345 Mo. 407 (1939) (being armed with dangerous weapon "clearly fixed the *grade* of the [burglary] crime" (emphasis added)); *State v. O'Neil*, 71 Minn. 399 (Minn. 1898) (robbery constitutes robbery in the first degree if "accused [is] armed with a dangerous weapon"); *People v. Rockhill*, 26 N.Y.S. 222, 223-24 (N.Y. 1893) (assault in the first degree if accused "assaults another with a loaded firearm or any other deadly weapon"); *State v. Cash*, 16 P. 144, 145 (Kan. 1887) (burglary in the first degree if accused breaks into occupied dwelling at night while "armed with some dangerous weapon"); *United States v. Bernard*, 24 F. Cas. 1131, 1131 (C.C.D.N.J. 1819) (interpreting element of attempted robbery of mail criminalizing "attempt[ing] to rob the mail by . . . threatening [the postmaster] with dangerous weapons" to include exhibiting a firearm

(citing Act of April 30, 1810 § 19, 2 Stat. 598)).[2] There is no historical tradition of enhancing a person's punishment for possessing a firearm in the face of a judicial finding that the firearm probably did not play a role in a crime.

**Second**, the government has identified no example of punishment's being enhanced for possessing firearms in connection with illegal trafficking in goods. Instead, the government's historical examples all involve enhancing punishment when a firearm was used in connection with a violent or person crime. Thus, Massachusetts's burglary statute provided for enhanced punishment if a person entered a house while armed and "inten[ding] to kill, rob, steal, commit a rape, or to do, or perpetrate any other felony." *See Commonwealth v. Hope*, 39 Mass 1, 9-10 (Mass. 1839). The same holds of the government's other examples.[3] *See Tutt*, 63 Mo. at 599 (burglary); *Alexander*, 56 Mo. at 132 (burglary); *O'Neil*, 71 Minn. 399 (robbery); *People v. Rockhill*, 26 N.Y.S. 222, 223-24 (N.Y. 1893) (assault); *Cash*, 16 P. at 145 (burglary); *Bernard*, 24 F. Cas. at 1131 (robbery).

---

[2] Actual statutory text easily available here: https://bityl.co/GcUn.

[3] The text of this statute is available here: https://bityl.co/Gcho.

Notably, trafficking crimes, such as smuggling, were prosecuted during the founding era. *See, e.g.*, *United States v. Brockius*, 24 F. Cas. 1242 (Pa. C.C. 1811); for a discussion of the regulatory scheme surrounding customs collection see generally Aaron T. Knapp, *From Empire to Law: Customs Collection in the American Founding*, 43 Law & Soc. Inquiry 554 (2018). Yet there is no evidence – and the government has pointed to none – that punishment in those cases was ever enhanced because the trafficker possessed firearms. The cases the government cites thus corroborate what *Bruen* has already recognized: the "by-now-familiar thread" of founding-era firearm restrictions is that they applied to the use of firearms in connection with violence or person crimes – not to their possession in connection with trafficking crimes. *Bruen*, 142 S. Ct. at 2145.

***Finally***, close examination of the government's historical evidence reveals an *absence* of evidence of enhanced punishment for firearms at the crucial time of ratification. *See Bruen*, 142 S. Ct. at 2136 ("Constitution rights are enshrined with the scope they were understood to have *when the people adopted them*" (emphasis in original) (citation omitted)). Ratification occurred in 1791. The firearm regulations the

government points to, by contrast, appear to have all been enacted years later, with the earliest enactment having occurred in 1805. *See Commonwealth v. Hope*, 39 Mass. 1, 9-10 (Mass. 1839). While "postenactment history" can be relevant to the extent it supports the existence of an "open, widespread, and unchallenged" type of firearm regulation that has existed "since the early days of the Republic," postenactment history that represents a *new type* of regulation that conflicts with the plain text of the Constitution is irrelevant; it cannot "overcome or alter . . . the original meaning of the constitutional text" *Id*. at 2136, 2137 (citation omitted). The government hasn't connected the postenactment history it cites with a broader tradition, established at the time of ratification, of enhancing punishment for firearm use during trafficking crimes. It thus fails to carry its burden at *Bruen* step two.

## Conclusion

The Court should vacate Mr. Alaniz's sentence because it was enhanced in violation of his constitutional rights.

Respectfully submitted this 11th day of January, 2023.


/s/ Miles Pope
Miles Pope

Assistant Federal Defender
Federal Defender Services of Idaho
Attorneys for Defendant-Appellant
MIGUEL MICHAEL ALANIZ

## Statement of related cases

Counsel for Defendant-Appellant MIGUEL MICHAEL ALANIZ is not aware of any related cases currently pending in this Court.

# Certificate of compliance

I am the attorney. **This brief contains 5332 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. 32(a)(5) and (6).

I certify that this brief (*select only one*):

[X] complies with the word limit of Cir. R. 32.1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (*select only one*):

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated: January 11, 2023    /s/ Miles Pope
                               Miles Pope
                               Assistant Federal Defender
                               Federal Defender Services of Idaho
                               Attorneys for Defendant Appellant
                               MIGUEL MICHAEL ALANIZ

## Certificate of service

1.      I hereby certify that on January 11, 2023, I electronically filed the foregoing Defendant-Appellant's REPLY BRIEF with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

2.      I hereby certify that on January 11, 2023, I electronically served the foregoing Defendant-Appellant's REPLY BRIEF on counsel for Plaintiff-Appellee, Christopher Booker, Assistant United States Attorney, via the United States Court of Appeals CM/ECF electronic filing system.

3.      I hereby certify that on January 11, 2023, I mailed the foregoing Defendant-Appellant's REPLY BRIEF to MIGUEL MICHAEL ALANIZ via the United States Postal Service by first class postage prepaid.

Dated:  January 11, 2023          /s/ Joy Fish
                                   Joy Fish